Filed 7/23/12

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,      )
            )
   Plaintiff and Respondent,  )
            )    S067519
     v.       )
            )
KEITH TYSON THOMAS,    )
            )   Alameda County
   Defendant and Appellant.  )  Super. Ct. No. 118686B
_____)

   A jury convicted defendant Keith Tyson Thomas of the first degree murder of Francia Young (Pen. Code, § 187, subd. (a)),[1] of kidnapping her for the purpose of robbery (§ 209, subd. (b)), of robbing her (§ 211), of forcibly raping her (§ 261, subd. (a)(2)), and of forcibly sodomizing her (§ 286, subd. (d)).  As to each of these offenses, the jury found true sentence enhancement allegations that a principal was armed with a firearm (§§ 12022, subd. (a) & 12022.3, subd. (a)), and, as to the rape and sodomy charges, that defendant acted in concert with an accomplice, Henry Glover, Jr. (§§ 264.1, subd. (a) & 286, subd. (d)(1)), and that defendant kidnapped Young for the purpose of committing these sexual offenses (§ 667.8, subd. (a)).  In conjunction with the murder verdict, the jury found true four special circumstance allegations:  that the murder of Francia Young was committed during her kidnapping for the purpose of robbery (§ 190.2, subd. (a)(17)(ii)), robbery (§ 190.2, subd. (a)(17)(i)), rape (§ 190.2, subd.

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

(a)(17)(iii)), and unlawful sodomy (§ 190.2, subd. (a)(17)(iv)). The jury found defendant did not personally use a firearm in committing these offenses against Young.

The jury also convicted defendant of robbing Sebrena Flennaugh (§ 211), assaulting two peace officers with an assault weapon (§ 245, subd. (d)(3)), and being a felon in possession of a firearm (§ 12021, subd. (a)). The jury found true the allegations that a principal was armed with a firearm during the Flennaugh robbery and the assaults on the police officers.

The jury returned a verdict of death for the murder of Young. The trial court denied defendant's motion to modify the verdict (§ 190.4, subd. (e)), sentenced defendant to death, imposed a concurrent sentence of life with the possibility of parole for the kidnapping of Young, and stayed imposition of sentence on the remaining counts.[2] This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTUAL BACKGROUND

### A. Guilt Phase

#### 1. Prosecution case

##### a. Crimes against Francia Young

In 1992, Francia Young, a 25-year-old African-American woman, lived with her mother in Oakland, California. Young worked in San Francisco as a computer analyst. She typically commuted to work by driving her car, a black Ford Mustang, to the MacArthur Bay Area Rapid Transit (BART) station, parking there, and taking the train to work. On December 8, 1992, Young left for work around 7 a.m. She was wearing a long

---

[2] As to the remaining crimes against Young, the trial court sentenced defendant to total terms of imprisonment of (1) four years for the robbery, (2) 24 years for the rape, and (3) 20 years for the sodomy. As to the crimes related to the Flennaugh robbery, the court sentenced defendant to total terms of imprisonment of (1) five years for the robbery, (2) 10 years for each of the assaults on the police officers, and (3) two years for possession of a firearm by a felon.

raincoat and had with her a multicolored umbrella she had borrowed from her mother. Young usually returned home around 5:30 in the evening, but she did not come back that night.

About 6:00 p.m. on December 8, 1992, William Dials had just left the MacArthur BART station and was walking down an adjoining street when he heard a woman scream from the other side of the street. Dials looked in the direction of the scream and saw two African-American men and an African-American woman standing near a dark colored Mustang. The man on the driver side of the vehicle, who appeared to be heavier than the man on the passenger side, got into the car with the woman. The man on the passenger side stood outside the car with his hands on the roof, looking around. After a few moments, the heavier man and the woman got out of the car and went toward the trunk; the woman then got into the trunk and the man closed the lid. The two men got into the car and, after waiting a minute or two, drove away. Dials returned to the BART station and reported what he had seen to BART officials and later to the Oakland Police Department. At trial, Dials testified that the heavier of the two men resembled Henry Glover, Jr., in body shape, while the thinner man resembled defendant in build.

Beginning at 8:04 p.m., three successful withdrawals of $100 each from Young's bank account were made through an automated teller machine (ATM) in Oakland. A fourth attempt to withdraw money from an ATM was unsuccessful because the maximum daily withdrawal limit had been reached.

At 8:30 that night, California Highway Patrol Officer Matthew Trezesniewski found Young's black Ford Mustang blocking the two right-hand lanes of eastbound Highway 580 near the Fruitvale exit. The abandoned car was damaged from striking a guardrail.

At 10:50 that night, two people tried to access Young's bank account through an ATM. The attempts were unsuccessful because the maximum daily withdrawal limit had been reached. A surveillance photograph taken during these attempts showed an

3

individual resembling defendant standing and holding an umbrella while another person attempted the withdrawal.

The next morning, December 9, 1992, Officer Ronald Andersen of the East Bay Regional Parks Department responded to a report of a dead body near a hiking trail in George Miller Regional Park in Point Richmond.  There Andersen found a pile of woman's clothing approximately 25 feet from the trailhead, and Young's body approximately 250 feet farther up the trail.  Her body was lying facedown, clothed only in a blazer.  Her arms were tied behind her back with a scarf and her ankles were tied together with a pair of pantyhose, which had also been tied to a tree branch.  A recently discarded condom wrapper was found several yards from the body.

Pathologist Charles Kikes performed the autopsy.  Young had been killed by a single gunshot to her head.  The gun had been fired into the back of her head while the muzzle of the weapon was in contact with her skin.  The bullet passed through her brain and came out near her right jaw.  Vaginal and anal swabs collected from the body by the pathologist indicated the presence of spermatozoa.  Doctor Edward Blake performed genetic testing on the swabs with the polymerase chain reaction (PCR) typing process.  The PCR results on both of the samples eliminated Henry Glover, Jr., as a possible donor, but not defendant.  As to the vaginal sperm sample, Dr. Blake calculated the frequency of that genetic profile in the general population as less than 1 in 100,000 persons.  Because of the more limited amount of genetic material in the anal swab, the frequency of the genetic profile that Dr. Blake obtained from that sample was 1 in 400.

### b.  Crimes against Sebrena Flennaugh

On the night of December 20, 1992, Sebrena Flennaugh, then eight or nine months pregnant, was in her apartment in Hayward, California, cooking dinner and talking on the telephone when she heard a knock on her door.  A person outside asked if someone unknown to her lived in the apartment, and she replied, "No."  As she ended her

4

telephone conversation, she heard someone begin kicking the door to the apartment. She dialed 911 on the telephone as the door's hinges gave way. Two men, whom she later identified as defendant and Henry Glover, Jr., entered the apartment; Glover pointed a rifle that looked like an AK-47 assault rifle at Flennaugh. As defendant grabbed the telephone from Flennaugh and disconnected the call, Glover began rummaging through Flennaugh's belongings. Defendant remained by the door as Glover went to other areas of the apartment, and he and defendant put various items into a duffle bag they had brought with them. Eventually Glover demanded to know where Flennaugh kept her money, and defendant hit her in the back of her head. After she told them there was money in her coat pocket, Glover took the money and, demanding more, punched Flennaugh in the face, bloodying her nose and knocking her to the floor.

At that point, two officers from the Hayward Police Department arrived in response to the disconnected 911 call and knocked on the door. After they announced their presence, Glover ran to the apartment's balcony while defendant remained inside. The officers, hearing the door to the balcony open, ran outside and saw Glover peeking over the edge of the balcony wall and pointing a rifle at them. Glover fired a shot that struck a wall within a foot of where the officers were standing. They fired back at Glover, but he jumped down from the balcony and, continuing to shoot at the officers, escaped.

Meanwhile, defendant remained in the apartment and told Flennaugh not to tell the police he was involved in the robbery. When the two police officers returned to Flennaugh's apartment, defendant told them he was on a social visit to Flennaugh and like her was a victim of the attempted robbery. He said he did not know the robber. Flennaugh, who was visibly shaken and had trouble speaking, did not contradict defendant's story, and the police eventually let defendant leave. Flennaugh did not tell the police that defendant was one of the two robbers until a detective came back the next day to talk to her about the incident.

5

*c. Investigation and defendant's confessions*

Based on Flennaugh's description of the robber and other information, Detective Frank Daley of the Hayward Police Department surmised that the suspect with the gun was Henry Glover, Jr., and further determined that Glover was staying in a motel in Oakland. On December 23, 1992, Daley questioned Glover at the motel and ultimately arrested him for the Flennaugh robbery. Later that day, homicide investigator Sergeant David Kozicki of the Oakland Police Department and Sergeant Larry Kiefer of the East Bay Regional Parks Department, who were investigating the Francia Young killing and suspected Glover was a participant in those crimes, searched Glover's motel room. They discovered, however, that all of the personal items in the room had been taken to the home of Glover's family members. After arriving at the family members' home, the officers seized an umbrella that Young's mother identified at trial as the one that she had lent to Young on the morning of the killing, and had the same pattern as the umbrella defendant was holding in the ATM photograph taken on the night of Young's murder. Glover's girlfriend, Camille Green, testified that defendant gave her the umbrella as a Christmas present in December of 1992.

After the Young killing, the police released to the media the ATM photograph showing one person (defendant) standing with an umbrella while another person was using Young's ATM card. At 1:20 a.m. on December 24, 1992, defendant turned himself in at the Oakland Police Department. Defendant told the desk officer that he was wanted for a murder connected to a BART station, he had seen his picture in the newspaper, and "just wanted to get this out of the way." Defendant, who by then was a suspected accomplice in the Flennaugh attempted robbery, was turned over to the Hayward Police Department.

On December 26, 1992, Sergeants Kozicki and Kiefer interviewed defendant in Hayward regarding the Francia Young crimes. After being advised of and waiving his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), defendant gave three

inconsistent stories regarding his involvement. First, he said that he was at a friend's house one night when Glover arrived around 10:15 and asked if defendant knew how to use an ATM card, as Glover wanted to withdraw money to post bail for Glover's sister. Defendant went with Glover, who was driving a black Mustang, to an ATM, where they withdrew $300. A couple of hours later, defendant and Glover drove the same car to another ATM to withdraw money, but this time they were unsuccessful.

After a break in the questioning, defendant gave a second version of the events. This time he told the officers that Glover had proposed robbing a grocery store, but first needed to obtain a car. Glover had seen a black Mustang parked at a BART station and suggested they wait for the owner and then steal the car. After identifying the car, Glover told defendant to retrieve a rifle Glover had hidden nearby. When defendant returned to the car, Glover was closing the trunk on someone inside. Defendant told the officers he suggested to Glover that they just let the person go and keep the car. Instead, they drove to Richmond. After parking the car, Glover got out and removed a woman from the trunk. Defendant stayed in the car listening to the radio, but after approximately 10 minutes, he got out to see what was happening. Defendant said he walked about 20 yards up a hill, where he saw the woman tied up with only a light-colored shirt on. Defendant said he was shocked and walked back down the hill to the car. About three minutes later Glover returned with the gun and they drove away. After withdrawing money from the ATM, they were driving on Highway 580 when the car spun out of control and hit a wall. They abandoned the car and met up later at Glover's motel room. Defendant told the officers he and Glover unsuccessfully attempted to use the woman's bank card and credit cards to withdraw more money later that night. Defendant denied having sexual intercourse with the woman, and said he did not know whether Glover had.

After a few minutes of additional police questioning, defendant admitted having had sexual intercourse with the woman. This time he told them that when he went 10 to 15 yards up the hill, he saw Glover having sex with the woman. Defendant then had sex

7

with her and ejaculated. Glover then walked the victim farther up the hill. Defendant denied involvement in killing the woman, saying he did not know of her death until he heard a news report about the crimes two days later.

Thereafter, the officers conducted a tape-recorded interview in which defendant summarized what he previously had told them. At trial, the jury heard the tape-recording.

Also during the interview conducted by Sergeants Kozicki and Kiefer, defendant admitted he had participated in robbing Sebrena Flennaugh. Glover had asked defendant to "watch his back" while Glover retaliated against someone who had "ripped him off."

### 2. *Defense case*

At the guilt phase of defendant's capital trial, defendant rested without presenting any evidence. In closing argument to the jury, defense counsel essentially conceded defendant's guilt of most of the offenses, explicitly contesting only the sodomy charge and the personal use of a firearm and special circumstance allegations.

## B. Penalty Phase

### 1. *Prosecution case*

At the penalty phase pertaining to Young's murder, the prosecution presented evidence of five unadjudicated criminal incidents involving defendant as well as his 1991 felony conviction for the transportation and sale of narcotics.

The first unadjudicated incident occurred on June 20, 1988, when a police officer found the then 14-year-old defendant, who was standing on a street corner in an area known for drug dealing, in possession of a loaded .25-caliber pistol.

The second and third incidents, one on October 19, 1989, and one on February 11, 1992, involved defendant's striking his girlfriend, Cathy Brown, in the face.

The fourth incident occurred on July 28, 1992, when defendant was in a group of six or seven youths who confronted Timothy McNulty and two of his friends. The two groups were passing on a sidewalk when someone in defendant's group tried to remove

8

something from McNulty's pocket. When McNulty confronted the person, someone else in defendant's group punched McNulty in the face, knocking him to the ground. When McNulty tried to get back up, defendant pushed him back down. The two groups then separated.

The fifth incident occurred on December 11, 1992 (three days after the murder of Francia Young). That day, Richard Warren's silver Dodge Colt car was stolen from the MacArthur BART station sometime before 6:00 p.m. At about 8:00 that evening, Constance Silvey-White had just parked her car at her home in Berkeley, and was walking down her driveway toward the street to retrieve her garbage cans when two men came out from behind a bush. One of them told her to be quiet and not to do anything. When she tried to get away from the man, he went after her and punched her in the face, causing her nose to bleed. Silvey-White saw the other man, whom she identified at trial as defendant, go to her car and release the trunk lid. The first man ordered Silvey-White to get into the trunk of the car, but she continued to struggle against him. Responding to her screams for help, a neighbor came outside, and the two men left. The neighbor testified that the men got into a silver Dodge Colt and drove away.

The prosecution also presented victim impact evidence. Mary Young, who was murder victim Francia Young's mother, and family friend Ely Gassoway described Francia as a kind person who helped others. She was very active in her church, where she sang in the choir and served as a financial secretary, a Sunday school teacher, and an usher. Mary and Francia were very close and the murder was devastating for Mary, who had difficulty sleeping for several months and eventually had to be hospitalized for a week, followed by grief counseling. Gassoway testified that Francia was like a daughter to him and her murder and her absence from his life was very painful to him.

9

## 2. *Defense case*

At the penalty phase, defendant called as a witness Berkeley Police Officer Pete Gomez to attempt to impeach Constance Silvey-White's identification of defendant as the second participant in the driveway attack on her. Officer Gomez testified that when he questioned Silvey-White shortly after the incident she was very upset. Although she was able to give Gomez some details regarding the appearance of the man who struck her, she could not provide similar details regarding the second man (defendant). According to Officer Gomez's written report, Silvey-White told him she could not see the second man very well. Initially, Silvey-White said that the two men were not trying to force her into the trunk of her car, but the next day she told Officer Gomez that they were trying to get her into the trunk.

Defendant also presented the testimony of several witnesses concerning his abusive and destructive family history. Three Alameda County social workers testified to certain aspects of defendant's childhood and relationship with his mother, Veronica Johnson. The social workers learned that as a child Johnson had been sexually and physically abused. When Johnson was 16 years old, she ran away after the aunt who was taking care of her beat her with an umbrella. Shortly thereafter, Johnson met defendant's father, Keith Tyson Thomas, Sr.; she became pregnant by him at age 17 and gave birth to defendant. When defendant was a mere toddler, Johnson would beat him for misbehavior. She told the social workers that beginning at the age of two defendant had been sexually active with other children in the neighborhood and with an adult roommate. When he was seven years old, defendant told a social worker that he did not recall those several incidents, but he mentioned other sexual activities. The social worker described the apartment in which Johnson and defendant were living as "extremely cramped" and unkempt. Johnson used the bedroom for herself, while defendant slept on a couch in the living room.

10

When defendant was seven years old, he was placed in a facility for neglected and abused children. Defendant eventually was returned to his mother's care, but when social workers learned she continued to beat him for disobedience, the police were notified and defendant was removed.

Defendant's paternal grandmother, Pauline Thomas, testified that when defendant was seven or eight years old and living in a foster home, he would stay with her during weekends. At first, defendant was very quiet and seemed afraid, although he seemed to be happy living in his foster home. Thomas testified that at one point defendant told her he wished he were dead. At some point defendant began living with Thomas full time, and did so for several months. Defendant had a friend in the neighborhood, he behaved, and became more relaxed. After defendant's mother took defendant back, Thomas did not see him for several years until defendant started living with his father in Sacramento. Because Thomas's mother also lived in Sacramento, Thomas would occasionally see defendant at her mother's home. Thomas remembered that defendant often took care of his father's girlfriend's disabled son. After defendant moved back to Oakland when he was approximately 14 years old, Thomas would see him only occasionally; she suspected that he was not heeding her advice to attend school and avoid involvement with undesirable people and activities. Thomas described defendant as basically a "good kid."

Defendant's father testified he had been largely absent from defendant's life because of the father's criminal activities, which included drug dealing and drug use, pandering, and violence. He had "quite a few" felony convictions, and spent time in prison as well as jail. Defendant was about 12 years old when, at his mother's request, he started living with his father in Sacramento. Also living there were the father's girlfriend, Joyce Smith, and several other people. All the adults in the house were drug and alcohol abusers.

Joyce Smith testified to the chaotic living conditions at her house when defendant lived there, together with a mentally disturbed friend of Smith's, Smith's drug-dealing

11

mother, and a man who drank heavily. Defendant presented no discipline problems at the house; he was very respectful and generally got along well with other children in the neighborhood and at school. Smith's son James was severely disabled from spina bifida and hydrocephalus. Defendant would change James's diapers, give him his medications and play with him. James could not speak, but would smile and laugh when defendant arrived home from school, and would cry when defendant left. Smith and defendant's father often had violent fights, and they eventually separated.

Psychologist Ranald Bruce testified that based on the information provided to him, he would characterize defendant's upbringing as a "confluence of abuse and rejection and abandonment," which likely would have resulted in defendant's "enter[ing] early adulthood with severely compromised psychological functioning." Children who, like defendant, experience deficient parenting, abuse, and rejection often have "unstable emotions, very low self-esteem, a tendency to have very bad mood swings, a lack of direction in life, [and] an inability sometimes to determine what's real and what's not real." Based on reports of defendant's sexual conduct with other children at a very early age, defendant, according to Bruce, may have been seeking attention and affection. In Bruce's opinion, a person with a background like defendant's would have "serious compromises in their ability to function appropriately," and "as the person goes through their life, the backlog of lack of success, of hopelessness, builds up and builds up and builds up. They become like a ticking time bomb. Sooner or later you're going to have something happen."

## II. PRETRIAL ISSUES

### A. Removal of the Public Defender's Office as Defendant's Counsel

Defendant contends that the trial court violated his constitutional and statutory rights to counsel when it terminated the public defender's office's representation of him. We disagree.

12

Defendant and Henry Glover, Jr., were jointly charged. The trial court eventually granted Glover's severance motion.[3] Before the severance, Glover moved to have the Alameda County Public Defender's Office removed as counsel for defendant. Glover asserted that the office had a conflict of interest because its attorneys had represented Glover in juvenile delinquency matters, and that in this case defendant was likely to take a position adverse to Glover's regarding their relative culpability. The public defender's office opposed Glover's motion. Initially, the trial court denied Glover's motion, finding that the deputy public defenders representing defendant had not obtained any confidential information regarding Glover's juvenile matters, and would not do so in the future. The court, however, later reconsidered its ruling and granted the motion, based on the view that the public defender's office as a whole owed Glover a continuing duty of loyalty that would be violated by any member of the office representing defendant in this case. The court then appointed Attorneys Alfons Wagner and William Cole to represent him.

As we will explain, defendant has not established a violation of his constitutional rights. Regarding defendant's claim that the trial court abused its discretion under statutory law by discharging the entire public defender's office, the court's ruling predated our decision in *In re Charlisse C.* (2008) 45 Cal.4th 145, in which we acknowledged appropriate limitations on the "vicarious disqualification rule" as applied to public law offices. As we explained, in deciding whether an entire public law office must be discharged from representing a client due to a conflict of interest that actually affects only some of its attorneys, "California courts have generally declined to apply an automatic and inflexible rule of vicarious disqualification in the context of public law

---

**3** Glover was tried and convicted of special circumstances murder and other offenses related to the crimes against Young and Flennaugh. After a jury was twice unable to reach a verdict at the penalty phase of Glover's trial, the trial court sentenced him to life imprisonment without the possibility of parole.

offices.  Instead, in this context, courts have looked to whether the public law office has adequately protected, and will continue to adequately protect, the former client's confidences through timely, appropriate, and effective screening measures and/or structural safeguards." (*Id.* at p. 162.)  Even assuming — without deciding — that in light of *Charlisse C.* the trial court in this case abused its discretion, we conclude any such abuse of discretion was harmless under the applicable standard.

The trial court's ruling removing the public defender's office as defendant's attorneys did not violate either his federal or his state constitutional right to counsel.  A defendant who requires appointed counsel does not have a constitutional right to a counsel of choice.  (*People v. Noriega* (2010) 48 Cal.4th 517, 522 (*Noriega*).)  In addition, the "replacement of one appointed attorney with another does not violate a defendant's constitutional right to effective assistance of counsel unless replacement counsel's representation" was ineffective.  (*Ibid.*)  Defendant has made no effort to show that replacement counsel's performance was deficient.  Here, the trial court removed the public defender's office because of a potential conflict of interest.  A "trial court does not violate a defendant's right to counsel under the state Constitution when it 'removes a defense attorney because of a potential conflict of interest.'  [Citation.]"  (*Id.* at p. 524.)  We decline defendant's request to reconsider our holdings in *Noriega*.

Finally, even assuming that the trial court abused its discretion under statutory law, defendant has not shown any such error was prejudicial.  He has not shown a reasonable probability (see *Noriega*, *supra*, 48 Cal.4th at p. 525) or possibility (see *People v. Brown* (1988) 46 Cal.3d 432, 447) that the jury would have reached a different verdict at either the guilt or the penalty phase of the trial had the public defender's office continued to represent him.  Insufficient to establish prejudice are defendant's speculative and conclusory assertions that attorneys in the public defender's office possessed more

expertise in capital cases than replacement counsel and the removal of the public defender resulted in a significant delay in the start of defendant's trial.**4**

## B. Admission of Defendant's Statements to Police

Before trial, defendant moved to exclude the statements he had made to Sergeants Kozicki and Kiefer regarding the Francia Young crimes, asserting that the officers had questioned him in violation of *Edwards v. Arizona* (1981) 451 U.S. 477 (*Edwards*).  After an evidentiary hearing, the trial court denied the motion.  Defendant now challenges that ruling.  We conclude the trial court's ruling was correct.

The testimony at the hearing established the following:  Defendant turned himself in to the Oakland Police Department in the early morning hours of December 24, 1992. Because Hayward police officers had already identified defendant as a suspect in the Sebrena Flennaugh robbery, defendant was transported to the Hayward Police Department.  There, around 2:00 a.m., he was questioned by Detective Frank Daley, who was investigating the Flennaugh crimes.  Defendant initially waived his rights under *Miranda*, *supra*, 384 U.S. 436, and spoke with the detective about the Flennaugh events. After about 25 minutes, however, defendant invoked his right to the assistance of counsel.  Detective Daley said that he was not permitted to ask defendant any more questions, and that defendant must be the one to initiate contact if he wished to talk to Daley again.  Daley then terminated the interview.

---

**4**    Defendant also asserts he was prejudiced because "without the delay necessitated by the removal of defense counsel, the district attorney would not have had the opportunity to name Glover as the shooter [at Glover's trial] and, when a jury was not persuaded, reverse the theory [at defendant's trial] and maintain [defendant] pulled the trigger."  But the separate trials of the codefendants were not the result of the delay following replacement of counsel for defendant; rather, the trials were severed to protect Glover's right to confrontation under *People v. Aranda* (1965) 63 Cal.2d 518 and *Bruton v. United States* (1968) 391 U.S. 123.  In any event, as we discuss in detail *post*, in part II.E., the outcome of defendant's trial was not prejudiced by any impropriety in the prosecutor's taking inconsistent positions concerning who actually killed Francia Young.

At 6:00 p.m. that same day, defendant told jail security officer Anna Christensen that he wanted to talk to a detective. After Christensen unsuccessfully attempted to contact the detective bureau by telephone, she mentioned the matter to Detective Richard Allen, who happened to be at the jail and was involved in the Flennaugh investigation. Detective Allen, who knew that defendant had invoked his right to counsel during the interview with Detective Daley, went to defendant's cell. Detective Allen told defendant that although Detective Daley was not available, Allen was familiar with the case. Allen then asked defendant whether, having invoked his right to counsel during the prior interview, defendant now nonetheless wanted to speak to the detective. Defendant confirmed he had invoked his right to counsel, adding that he had "spoken to an attorney," that he wanted "to make this right," and that he wanted "to talk about it." Detective Allen then took defendant to an interview room, where he advised defendant of his *Miranda* rights, and confirmed several times that although defendant had previously invoked his right to counsel, he now wanted to talk to the detective without counsel present. Defendant then discussed the Flennaugh crimes with the detective. The Francia Young crimes were not mentioned.

On the morning of December 26, 1992, Detective Allen told Sergeant Kozicki that defendant had reinitiated contact with the detectives, agreed to be interviewed, and made a statement concerning the Flennaugh crimes. At Kozicki's request, a deputy district attorney reviewed the tape recording of Detective Allen's interview of defendant, then told Kozicki it would be legally permissible to interview defendant. Later that afternoon, Sergeants Kozicki and Kiefer, who knew that defendant had invoked his right to counsel during the first interview with Detective Daley, went to the Hayward Police Department and met with defendant in an interview room. After Kozicki introduced himself and Kiefer, without mentioning what specific case they were investigating, Kozicki advised defendant of his *Miranda* rights. Defendant agreed to waive his rights and speak to them,

16

and ultimately made incriminating statements about the crimes relating to the murder of Francia Young.

Contrary to defendant's contention, the interview with Sergeants Kozicki and Kiefer did not violate *Edwards*, *supra*, 451 U.S. 477, and defendant's statements made during that interview were properly admitted into evidence.

In *Edwards*, *supra*, 451 U.S. 477, the high court held that, once a suspect has asserted the right to counsel during custodial interrogation, the suspect "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Id.* at pp. 484-485.) If further conversations are initiated by the police when there has not been a break in custody, the defendant's statements are presumed involuntary and inadmissible as substantive evidence at trial. This is true even when the defendant again waives his *Miranda* rights and his statements are voluntary under traditional standards. Moreover, the *Edwards* rule "is not offense specific." (*McNeil v. Wisconsin* (1991) 501 U.S. 171, 177, italics omitted.) "Once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding any offense unless counsel is present." (*Ibid.*, italics omitted.)

The purpose of the rule in *Edwards*, *supra*, 451 U.S. 477, is to preserve " 'the integrity of an accused's choice to communicate with police only through counsel,' [citation] by 'prevent[ing] police from badgering a defendant into waiving his previously asserted *Miranda* rights,' [citation]. " (*Maryland v. Shatzer* (2010) 559 U.S. ___, ___ [130 S.Ct. 1213, 1220] (*Shatzer*).) It "is not a constitutional mandate, but judicially prescribed prophylaxis." (*Ibid.*) Application of the *Edwards* rule "is 'justified only by reference to its prophylactic purpose' " and its presumption is not to be uncritically extended. (*Ibid.*) As the high court observed in *Shatzer*, "[t]he *Edwards* presumption of involuntariness is justified only in circumstances where the coercive pressures have

increased so much that suspects' waivers of *Miranda* rights are likely to be involuntary most of the time."  (*Shatzer*, *supra*, 559 U.S. at p. ___ [130 S.Ct. at p. 1226].)

Defendant here argues, in essence, that because under the rule of *Edwards*, *supra*, 451 U.S. 477, a suspect's invocation of the Fifth Amendment's right to counsel during police questioning is considered to encompass all questioning regarding all offenses, any later reinitiation of contact by the suspect with the police can be considered a waiver of the invocation only as to the particular offense that is the subject of the reinitiation. Accordingly, defendant asserts, his decision to talk to Detective Allen "waived" the *Edwards* rule only as to questioning regarding the Flennaugh crimes, and did not extend to any questioning concerning the Francia Young killing.  Defendant misperceives the nature of the *Edwards* rule.

In reviewing the propriety of police questioning after an invocation of the Fifth Amendment right to counsel and a later reinitiation of contact by the suspect, a court must determine whether the purpose of the *Edwards* presumption of involuntariness — to prevent police badgering leading to coerced confessions — would be served by applying the presumption in that particular case.  The circumstances in this case show that defendant's statements to Sergeants Kozicki and Kiefer were not coerced by police badgering.  It was defendant who initially invoked his constitutional right, but then told the Hayward detective that he wanted to talk to the detective without counsel present. Without more, there is no reason to conclude that the statements defendant later gave to Sergeants Kozicki and Kiefer about the Francia Young crimes — after again being properly advised of his *Miranda* rights and again agreeing to waive those rights — resulted from improper badgering and coercion by those officers.  There is no reason why, if defendant did not want to talk with Sergeants Kozicki and Kiefer without an attorney present, he could not have simply said so, and there is no reason to doubt that defendant knew this, given that the first time he had asserted his right to counsel the questioning had immediately ceased and no attempts to question him were made until he

18

volunteered to talk.  (See *Shatzer*, *supra*, 559 U.S. at p. ___ [130 S.Ct. at p. 1221] [that police honored the defendant's earlier invocation of the right to counsel is considered a factor in determining that a later statement was not coerced].)  Uncritical application of the *Edwards* presumption in these circumstances would not serve the purpose of that rule.  Accordingly, the cost of its application — the exclusion of an otherwise voluntary confession — clearly would outweigh the benefit.

To the extent that in some circumstances a suspect's reinitiation of contact with the police could be deemed to affirmatively limit questioning to only certain crimes, that did not happen here, contrary to defendant's assertions on appeal.  (See *Connecticut v. Barrett* (1987) 479 U.S. 523, 529.)  Even if the record in this case is read as establishing that defendant said only that he wanted to talk about the Flennaugh crimes with the Hayward detective, it does not establish that he wanted to talk *only* about the Flennaugh crimes with the Hayward detective.  In other words, defendant never said he did not want to talk about any crime other than the Flennaugh robbery and shootout.  (See *People v. Waidla* (2000) 22 Cal.4th 690, 726-727; *People v. Thompson* (1990) 50 Cal.3d 134, 162-164.)  His explicitly volunteering to talk about the Hayward crimes was not surprising, given that he was in the Hayward jail, and at that time had only been questioned by a Hayward detective about the crimes that occurred in Hayward.  But defendant's failure to mention other crimes when he asked to talk to a detective simply cannot be understood as equivalent to an assertion that he considered questioning regarding other crimes to be off limits, especially in light of the fact that defendant turned himself in to the Oakland police in response to news coverage of the Young crimes.  Moreover, once again, if defendant actually did wish to limit the police questioning to the Flennaugh crimes, he was free to say so both when Sergeant Kozicki identified himself as a homicide detective from the Oakland Police Department, and again when the subject of the Young crimes was broached during the questioning.  Defendant, of course, did not do so, but instead, after he was again properly advised of and again waived his *Miranda* rights, he

19

proceeded to speak with the officers about the Francia Young crimes. There was no violation of defendant's Fifth Amendment right to counsel and his statements to Sergeants Kozicki and Kiefer were properly admitted.

### C. Failure of the Police to Record All of Defendant's Statements

Sergeant Kozicki testified that, following standard operating procedures of the Oakland Police Department, he did not tape record his initial discussions with defendant about the Francia Young crimes, but only recorded defendant's final statement summarizing what defendant had already told the officers. Defendant contends, as he did in a motion to suppress his statements, that the failure to tape-record all of the discussions, including his *Miranda* waivers, violated his right to due process, constituted the destruction of exculpatory evidence in violation of *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*), and rendered the evidence insufficient to support the conclusion that his *Miranda* waivers were voluntary. We disagree.

We have previously rejected the claim that fundamental fairness requires that any incriminating statements made by the suspect must be excluded from admission into evidence unless there is a complete tape recording of a police interview. (*People v. Holt* (1997) 15 Cal.4th 619, 663-665; see also *State v. Lockhart* (Conn. 2010) 4 A.3d 1176, 1182-1200 [exhaustively discussing and rejecting claims that recording of police interviews of criminal suspects is constitutionally required, or that such a rule should be imposed under the court's supervisory authority].) Defendant provides no compelling reason for us to revisit that conclusion.

Defendant's *Trombetta*, *supra*, 467 U.S. 479, claim also lacks merit. To establish a violation of his rights under *Trombetta*, it must be shown both that evidence with an exculpatory value apparent on its face was destroyed and that defendant could not obtain comparable evidence by any other available means. (*Id.* at p. 489.) Here, there is no evidence in the record that any exculpatory material in the unrecorded portion of the

20

discussions was destroyed. Even if we were to assume that the officers' failure to record the entire interview constitutes a failure to preserve evidence under *Trombetta*, defendant merely speculates that what was said in that portion of the interview might not have been what Sergeant Kozicki wrote in his notes and testified to at the trial, and that some aspects of the conversation not preserved in a contemporaneous recording might have been helpful to the defense. Such speculation is insufficient. (See *People v. Fauber* (1992) 2 Cal.4th 792, 829-830 (*Fauber*).) Moreover, the absence of a tape recording of the entire interview did not deny defendant all opportunity "to obtain comparable evidence by other reasonably available means." (*Trombetta*, *supra*, 467 U.S at p. 489.) Defendant was able to cross-examine Kozicki at trial, and defendant himself was available to testify regarding the interview if he chose to do so.[5]

Finally, as we have done regarding similar claims in the past, we reject defendant's contention that the absence of a recording of the *Miranda* advisements and his waiver of his rights precludes the conclusion that his waiver was knowing and voluntary. (See *People v. Gurule* (2002) 28 Cal.4th 557, 602-603.) To the contrary, Sergeant Kozicki testified to the circumstances of defendant's waiver, and the prosecution presented a signed waiver form indicating defendant understood and waived his rights. Defendant did not present any contrary evidence. The circumstances surrounding the questioning defendant mentions on appeal, such as his age (19 years old

---

[5] There is no constitutional infirmity in the circumstance that if defendant had wanted to expand on the information presented by Kozicki's notes and testimony by testifying himself, he might have been put in the position of choosing between his right to testify at the trial and his right to remain silent. " ' "The criminal process . . . is replete with situations requiring the 'making of difficult judgments' as to which course to follow. [Citation.] Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." ' [Citations.]" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 153.)

at the time of the interview) and the period of time he had been in custody (approximately 63 hours), do not undermine the evidence establishing the validity of his waivers.

Similarly unsupported is defendant's allegation that Sergeant Kozicki engaged in "trickery" by implying that the case against defendant was already strong, thereby assertedly undermining the voluntariness of his *Miranda* waiver. We will assume for argument's sake that informing a suspect of the strength of preexisting incriminating evidence *before* obtaining a *Miranda* waiver could in some circumstances constitute improper coercion undermining the voluntariness of the waiver. (But see *People v. Hill* (1967) 66 Cal.2d 536, 549 [" 'intellectual persuasion is not the equivalent of coercion' "].) There was no such improper coercion here, however. Although before advising defendant of his *Miranda* rights Sergeant Kozicki unintentionally placed within defendant's view the waiver form that codefendant Henry Glover, Jr., had signed, Kozicki testified only that defendant *may* have seen the form. Absent evidence that defendant *did* see Glover's form, his assertion that the inadvertent display of the form could have affected the voluntariness of his *Miranda* waiver is mere speculation. In addition, contrary to defendant's assertion on appeal, Kozicki did not discuss the ATM photograph of defendant or the fact that Glover had spoken with the police until *after* defendant waived his rights. We further note that defendant had *turned himself in* because he had seen the ATM photograph in the newspaper. In other words, he already knew the police had a strong case against him and he had already chosen to communicate with the police. We therefore conclude that the voluntariness of defendant's waiver of his *Miranda* rights was not affected by any actions by Sergeant Kozicki that may have implied that the case against defendant regarding the Francia Young crimes was already strong.

## D. Denial of Motion to Exclude Constance Silvey-White's Identification of Defendant as One of Her Attackers

Defendant moved before trial to exclude testimony and evidence regarding Constance Silvey-White's identification of him as one of the two men who attacked her in her driveway. He contends on appeal that the trial court erred by denying the motion. The trial court did not err.

" 'In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification.' [Citation.] 'We review deferentially the trial court's findings of historical fact, especially those that turn on credibility determinations, but we independently review the trial court's ruling regarding whether, under those facts, a pretrial identification procedure was unduly suggestive.' [Citation.] 'Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification.' [Citation.]" (*People v. Alexander* (2010) 49 Cal.4th 846, 901-902; see also *People v. Cunningham* (2001) 25 Cal.4th 926, 989-900; *Simmons v. United States* (1968) 390 U.S. 377, 384 [even if a witness has been subjected to a suggestive pretrial identification procedure, "eyewitness identification at trial . . . will be set aside on that ground only if the [pretrial] identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification"].) In addition, the United States Supreme Court recently clarified that the federal Constitution's due process clause is not implicated when the circumstances asserted as

23

creating an improperly suggestive identification procedure were not arranged by law enforcement officers. (*Perry v. New Hampshire* (2012) 565 U.S. ___, ___ [132 S.Ct. 716, 721] (*Perry*) [the application of the due process clause "turn[s] on the presence of state action and aim[s] to deter police from rigging identification procedures"].)

Because we reject defendant's claim that the lineup procedure arranged by the police in this case was unduly suggestive and unnecessary, we need not address the reliability of the identification. The factual circumstances regarding Silvey-White's identification of defendant were as follows: The attack on her occurred on December 11, 1992. The officer who took her statement at the scene had written in his report that she "did not see suspect number two very good." Inspector Daniel Wolke of the Berkeley Police Department first spoke to Silvey-White about the incident on December 14, 1992. On December 17, 1992, Wolke took her to San Jose to work with an artist on a composite drawing of the man who attacked her. According to Inspector Wolke's testimony, Silvey-White said she did not think that she could complete a composite drawing of the second suspect because "she had a better recollection of number one."

On January 7, 1993, after Silvey-White returned from a trip to Texas, Inspector Wolke brought her to a live lineup conducted by the Oakland Police Department. Wolke told her the persons who had attempted to kidnap her might or might not be there. Silvey-White testified that she had not been told how many suspects might be participating in the lineup, and "had no way of knowing" if any of them actually would be there.

Present in the lineup were defendant, Henry Glover, Jr., and six other African-American men. Each participant was directed to put on a baseball cap and then a knit cap, and also to say the words the attacker had spoken to Silvey-White during the incident. She positively identified Henry Glover, Jr., as the man who had assaulted her, by placing an "X" in Glover's position on her lineup card. She placed a question mark in defendant's position on the card. As she later explained to Inspector Wolke and testified

24

to at the suppression hearing, she used a question mark because she recognized defendant as the second suspect, but was less sure than with her identification of the first suspect. She also told Wolke that she had at first considered another person in the lineup as a possible match for the second suspect, but as she continued to study the lineup she concluded that defendant was the one. At the preliminary hearing, the hearing on the motion to suppress, and in her trial testimony, Silvey-White identified defendant as the second suspect. She testified at trial that she had no doubt in her mind that defendant was the second person involved in the attack.

Defendant first contends the lineup was unduly suggestive because (1) Inspector Wolke had told Silvey-White that the attack on her might have been related to the Francia Young crimes, and (2) the local news media had been covering that story, and therefore Silvey-White "had ample opportunity to view images of the BART murder suspects prior to the lineup." Even assuming defendant has alleged sufficient police involvement in the asserted suggestive procedures as required by the *Perry* holding, his contention nonetheless lacks merit. (See *Perry*, *supra*, 565 U.S. at p. ___ [132 S.Ct. at pp. 727-728] [mentioning as an example of non-police-arranged circumstances, the suggestiveness created if "a witness identifies the defendant to police officers after seeing a photograph of the defendant in the press captioned 'theft suspect,' or hearing a radio report implicating the defendant in the crime"].) Silvey-White testified she did not see any photographs of the Young murder suspects before she left for Texas, there was no coverage of the murder in Texas, and she had returned to Oakland only a day or two before the lineup. Because defendant merely speculates that she could have seen photographs of the Young murder suspects, he has not demonstrated that the identification procedure was unduly suggestive in this regard. Moreover, even if Silvey-White had seen photographs of those suspects, this would not lead to the conclusion that having her view the lineup to identify the suspects in her case would have been unnecessarily suggestive as a matter of due process. This is especially so in light of

25

safeguards taken to ensure the fairness of the lineup, such as the police informing her that the perpetrators in her incident might not be in the lineup, and the police compiling a reasonably balanced group of subjects for Silvey-White to view.

Defendant next argues that the nature of the lineup itself made it unduly suggestive. He asserts: (1) Glover was the only subject who, consistent with Silvey-White's description of the man who attacked her, had "substantial" facial hair; (2) the presence of Glover and defendant in the same lineup, in effect, made the lineup as to defendant only a seven-person lineup because "there was every reason to believe she would pick out Glover as the assailant"; and (3) the joint lineup "allowed [her] to focus upon the remaining men as the accomplice rather than the assailant," and "permitted [her] to compare the participants to one another . . . and also to Glover."

These circumstances do not make the lineup unduly suggestive as to defendant.[6] Even if we agreed that Glover stood out from the others, the lineup still contained seven others. Defendant's assertion that two of the remaining seven "appear to have moustaches" and that he and two others were clean-shaven does not establish the participants were so sufficiently unlike each other as to make the lineup unduly suggestive. Moreover, defendant's argument is also contradicted by Silvey-White's report that she initially thought another participant in the lineup might have been the second suspect before she settled on defendant as the perpetrator. Defendant has failed to establish that the Silvey-White lineup was unduly suggestive and unnecessary.

---

[6] In his reply brief, defendant observes that he and two other participants in the lineup were clean-shaven, two others appear to have had moustaches, and it is not clear whether the last two participants had any facial hair. He then claims that "[f]or an important characteristic — facial hair — [he] was part of a very small group of three to five men," and that this circumstance made the lineup suggestive as to him. We disagree. Defendant has not shown that facial hair was a necessarily defining consideration or explained how this situation rendered the lineup unduly suggestive as to him.

**E. Denial of Motion to Dismiss Personal Use of a Firearm Allegations Based on Prosecution's Inconsistent Theories Concerning the Actual Killer**

Before trial, defendant moved to dismiss allegations he personally used a firearm during the crimes against Francia Young on the ground that the same prosecutor had filed the same personal firearm use allegations against Henry Glover, Jr., and had argued at Glover's separate trial that *Glover* fired the single fatal shot. Defendant asserted that it would be prosecutorial misconduct if the prosecution was allowed to present inconsistent theories regarding who was the actual killer and a violation of his right to a fair trial. The trial court denied the motion. It agreed with the prosecutor that because the evidence was conflicting and Glover's jury had found the personal use allegations not true as to Glover, defendant's jury could consider whether defendant was the actual killer.

Before the closing arguments at the guilt phase of the trial, defendant moved to preclude the prosecutor from arguing that he was the actual killer, or, in the alternative, to permit the defense to present evidence of the prosecutor's argument at Glover's trial that Glover was the actual killer. The trial court denied the motions. The prosecutor argued to the jury that defendant's own statements to the police established that only he handled the rifle, and therefore the jury should find that defendant was the person who shot Francia Young. The jury, however, rejected the personal use allegations.

Defendant contends the trial court's rulings were erroneous and that, notwithstanding the jury's verdict on the personal use allegations, he was prejudiced at both the guilt and penalty phases of trial by the error. We need not consider defendant's assertion that the trial court's rulings were in error. Allowing the prosecution to pursue the personal use allegations against defendant and to argue he was the actual killer was harmless beyond a reasonable doubt.

The trial court's rulings clearly had no prejudicial effect on the guilt phase verdict. The verdict forms specifically directed the jury to find whether defendant "did" or "did not" personally use a firearm during the offenses, not whether the allegation was true or

27

not true. The jury's determination that defendant did not use the firearm compels the conclusion beyond a reasonable doubt that the personal use allegations did not influence the jury's decision adversely to defendant at the guilt phase.

We are also unpersuaded by defendant's argument that the jury's consideration of the personal use allegations at the guilt phase could have prejudicially affected the penalty verdict. Here, as noted above, the jury's verdict was that defendant did not personally use the firearm during the offenses, a verdict that necessarily implied that the jury in this trial concluded that Glover used the gun and was the actual killer. It is therefore clear that the jury did not consider or use the personal use allegations as aggravating factors at the penalty phase.

This conclusion is further supported by both the prosecution and the defense explicitly stating in their arguments that the jury had determined that defendant had actually not used the firearm during the offenses. During closing arguments, the prosecutor said: "Now this bears some discussion. Bear in mind, however, that by your verdict in the guilt phase, finding him to have not used a firearm, you found him to be the non-shooter, so he was an accomplice in Francia's murder. You found him to be the non-shooter. That means that Glover was the shooter in your mind. Therefore, he was the non-shooter."

Defense counsel expressed the same interpretation of the personal use allegation verdicts at the beginning of his argument to the jury: "Needless to say, we are particularly gratified on your vote on the gun use . . . because I believe, particularly now that all the evidence is in, that it does show that while he's been rightly — rightly convicted of murder, he is not a killer. And I am gratified that the district attorney accepts that verdict, also, and has told you that." Defense counsel also argued that the jury should consider as a mitigating factor that defendant was not the actual killer.

We conclude there is no reasonable possibility that defendant would have received a more favorable penalty verdict had the personal firearm use allegations been stricken,

28

or had the jury been informed that the prosecutor had argued Glover was the actual killer at the latter's trial.

## F. Failure to Excuse Prospective Jurors For Cause

Defendant contends the trial court erred by denying his motions to excuse for cause four prospective jurors. As defendant acknowledges, the claim is not preserved because he used only 16 of his 20 peremptory challenges in choosing the jury, and he did not express dissatisfaction with the jury when it was seated. (*People v. Beames* (2007) 40 Cal.4th 907, 924; *People v. Williams* (1997) 16 Cal.4th 635, 667.) We decline defendant's invitation to revisit these requirements for preserving such claims for appeal. (See *People v. Gordon* (1990) 50 Cal.3d 1223, 1247.) Moreover, as none of the prospective jurors at issue served on the jury that rendered the verdicts in this case, there is no possibility that any error could have been prejudicial.[7] (*Beames*, at pp. 924-925; *People v. Avila* (2006) 38 Cal.4th 491, 540.)

## III. GUILT PHASE ISSUES

## A. Admission of Crime Scene Photographs of the Victim

Defendant contends the trial court abused its discretion and violated his federal constitutional right to due process by admitting at trial, over his objections, photographs of Francia Young at the murder scene depicting the state of her body and her wounds. Defendant argued the jury's viewing of the photographs would be more prejudicial than probative. (Evid. Code, § 352.) We have reviewed the photographs at issue, and, like most photographs of murder victims, they are disturbing and unpleasant. Nonetheless, we conclude that the trial court did not abuse its discretion in overruling defendant's objections. The photographs were admissible to show the nature of the murder and to

---

[7] One of the prospective jurors at issue was seated as an alternate juror, but was never called to serve as a seated juror.

explain and corroborate other evidence. (See *People v. Riggs* (2008) 44 Cal.4th 248, 303-304 (*Riggs*); *People v. Lewis* (2001) 25 Cal.4th 610, 641-642.) Because there was no abuse of discretion, the constitutional aspect of defendant's claim is also without merit. (*Riggs*, *supra*, at p. 304.)

## B. Testimony Defendant Requested an Attorney During Police Interview

Defendant contends that the trial court erred in denying his motion for a mistrial after a detective testified that defendant during a police interrogation asked for an attorney. We disagree.

During the direct examination of Hayward Police Detective Daley concerning his interview with defendant, the prosecutor asked Daley if defendant had denied being involved in the Sebrena Flennaugh robbery, and Daley answered that defendant had done so. The prosecutor then asked, "And was all questioning stopped at that point in time?" Daley answered, "After a few minutes, he said he wanted a lawyer, and I stopped." The prosecutor asked no further questions, and cross-examination by the defense began. At the next break in the proceedings, defense counsel moved for a mistrial based on Detective Daley's having informed the jury that defendant had asserted his constitutional right to counsel. The prosecutor represented to the court that Daley's comment was unanticipated, gratuitous, and nonresponsive. The trial court ruled that error had occurred, but the error did not "rise[] to the level that it denies [defendant] his right to a fair trial."

Under *Doyle v. Ohio* (1976) 426 U.S. 610, 619, the use against defendant of a postarrest invocation of rights following a *Miranda* admonition violates due process. (*People v. Clark* (2011) 52 Cal.4th 856, 959.) The *Doyle* rule is not violated when " 'the evidence of defendant's invocation of the right to counsel was received without objection and the remarks of the prosecutor did not invite the jury to draw any adverse inference from either the *fact* or the *timing* of defendant's exercise of his constitutional right.' "

(*People v. Huggins* (2006) 38 Cal.4th 175, 199.)  Moreover, a "*Doyle* violation does not occur unless the prosecutor is *permitted* to use a defendant's postarrest silence against him at trial . . . ."  (*Clark*, at p. 959.)  Here, the prosecutor did not attempt and was not permitted to use the comment against defendant by inviting the jury to draw any adverse inferences from the remark.  Accordingly, there was no violation of the *Doyle* rule.

In any event, even if the testimony could be considered a *Doyle* violation, we would conclude any error was harmless beyond a reasonable doubt.  Defendant's initial denial of his involvement in the Flennaugh robbery was impeached not by his invocation of right to counsel, but by his later admission to Sergeants Kozicki and Kiefer that he had, in fact, been a participant in the crimes.  Moreover, his guilt of the offenses arising from this incident was overwhelming and was not contested at trial.  (See *Brecht v. Abrahamson* (1993) 507 U.S. 619, 630 [the *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) harmless beyond a reasonable doubt standard applies to *Doyle* error]; *Riggs*, *supra*, 44 Cal.4th at p. 299 [no prejudicial *Doyle* error occurred when the testimony did not "impeach defendant's later statements to the police by reference to his earlier decision not to talk with them, which is the harm the holding of *Doyle* seeks to prevent"]; *People v. Hinton* (2006) 37 Cal.4th 839, 868 ["defendant's invocation of his *Miranda* rights was both cumulative of — and inferior to — the other evidence indicating that he had fabricated the account he eventually provided during police interviews and reiterated at trial"]; *People v. Hughes* (2002) 27 Cal.4th 287, 332 [any *Doyle* error was harmless beyond a reasonable doubt "in light of the overwhelming evidence" of the defendant's guilt].)

### C.  Asserted Prosecutorial Misconduct During Argument to the Jury

Defendant contends the prosecutor committed misconduct during his arguments to the jury at the conclusion of the guilt phase.  He asserts that comments made by the prosecutor shifted the burden of proof to the defense and "mischaracterized defense

counsel's argument as substantive evidence that rendered deliberations superfluous." Defendant has failed to preserve these claims for appeal. In addition, his claims lack merit.

"Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' [Citation.] By contrast, our state law requires reversal when a prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury' [citation] and ' "it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct" ' [citation]. To preserve a misconduct claim for review on appeal, a defendant must make a timely objection and ask the trial court to admonish the jury to disregard the prosecutor's improper remarks or conduct, unless an admonition would not have cured the harm." (*People v. Davis* (2009) 46 Cal.4th 539, 612 (*Davis*).) A claim will not be deemed forfeited due to the failure to object and to request an admonition only when "an objection would have been futile or an admonition ineffective." (*People v. Arias* (1996) 13 Cal.4th 92, 159.)

During his initial argument to the jury, the prosecutor described the evidence of defendant's guilt of the substantive offenses as overwhelming and uncontroverted by the defense, and said that the only real issue in the case was who actually shot Francia Young. Defendant did not object to these comments. Defense counsel began his argument to the jury by conceding "there is overwhelming evidence about certain counts." Counsel continued: "It's obviously clear that he has admitted — and there's plenty of evidence besides his admissions — to a kidnap, a rape and a robbery. There is no question about that. [¶] As far as the application of the felony-murder rule, [that] will be apparent to you as you get instructed by the Judge, and you can make your own judgment on that." Defense counsel then argued that the "main battlefields . . . are the sodomy charges and then what actually happened up on the hill at the site of the killing"

32

regarding defendant's involvement in the murder, use of the firearm, and mental state at the time of the crimes as it related to the special circumstance allegations.

In his rebuttal argument, the prosecutor initially focused on defense counsel's concessions. The prosecutor stated: "So based upon his argument, when you get the verdict forms, I would like you all to go upstairs and get Count One out. And Count One alleges guilt or non-guilt of the murder. He's conceded it. So go up there, take the verdict form of Count One, and write in 'guilty.' " The prosecutor then proceeded to invite the jury to do the same as to each count except the sodomy charge. Defendant did not object to the argument, except with regard to the counts charging defendant with being a felon in possession of a firearm and with the assaults on the Hayward police officers on the ground that the prosecutor's statements that the defense had conceded guilt on those counts misstated the record. The trial court overruled the objections. The prosecutor revisited this theme at the conclusion of the argument when he told the jury that "to make these deliberations go more quickly, fill out the guilty forms of the ones I told you they conceded[,] and then discuss the sodomy, then discuss the special circumstances, and then discuss the use of the firearm." Defendant did not object to this comment.

Defendant did not object at trial that the prosecutor's comments had shifted the burden of proof to the defense, or had invited the jury to consider defense counsel's statements as proof of defendant's guilt. Defendant only objected to two particular statements on the ground that the prosecutor had misstated the record, apparently asserting that defense counsel had not conceded defendant's guilt as to the specific charges of possession of a firearm by a felon and assault on a police officer with a firearm.

Even to the extent that defendant's pretrial motion to "federalize" all defense objections was granted, the effect of granting the motion was, as the trial court stated, that the trial objections would be "deemed to be made under both California and Federal

law." This did not excuse defendant from the obligation of stating the *specific ground* for an objection in order to preserve the issue for appeal. (See *People v. Stanley* (2006) 39 Cal.4th 913, 952 [" 'a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety' "].) Defendant's limited objection at the trial that the prosecutor's argument had misstated the record as to particular charges did not encompass the contentions he raises on appeal, and his appellate claims therefore are forfeited. (See *People v. Cook* (2006) 39 Cal.4th 566, 607 (*Cook*) [objection at trial that a question posed to the witness was argumentative did not preserve an appellate claim that the prosecutor committed misconduct by attempting to shift the burden of proof].) There is no support for defendant's assertion on appeal that the trial court necessarily would have overruled objections based on the specific grounds he now raises on appeal, and therefore that his failure to have objected on those grounds should be excused based on the futility of making the objections at trial.

Defendant's allegations of prosecutorial misconduct are also without merit. First, contrary to defendant's assertion, the prosecutor's comments did not indicate to the jury that defendant bore some of the burden of proof. Rather, the statements argued that the evidence of guilt was so overwhelming defense counsel had conceded defendant's guilt of most of the charges. (*Cook*, *supra*, 39 Cal.4th at p. 608 ["A prosecutor may make fair comment on the state of the evidence."]; see also *People v. Redd* (2010) 48 Cal.4th 691, 740 [concluding no misconduct occurred when, in light of the "overwhelming and seemingly irrefutable evidence that defendant committed the crimes charged, the prosecutor's comments merely highlighted his observation that there seemed to be no coherent defense to the charges"]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1340 (*Bradford*) [observing that "[a] distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an

improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence"].)  Similarly, the statements inviting the jury to simply "fill out" the guilty verdict forms as to the uncontested charges would reasonably be considered by the jurors as comment on the overwhelming evidence of guilt supporting those charges, not as an improper suggestion that the jurors need not be convinced of defendant's guilt of the elements of each charge.  (See *People v. Samayoa* (1997) 15 Cal.4th 795, 841 [when a claim of misconduct "focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion"].)

Second, even if we could discern some impropriety in the prosecutor's statements, we could not conclude there was reversible misconduct under either the federal or California standard.  The evidence regarding the charges at issue was overwhelming, and the defense did not contest guilt as to most of the charges.  The trial court properly instructed the jury that the arguments of counsel did not constitute evidence, and that the prosecution bore the burden of convincing each juror of defendant's guilt of each charge beyond a reasonable doubt, instructions we presume the jury followed.  (*People v. Harris* (1994) 9 Cal.4th 407, 426 [recognizing, as a "sound presumption of appellate practice, that jurors are reasonable and generally follow the instructions they are given"].)

## IV.  PENALTY PHASE ISSUES

### A.  Denial of Motion to Preclude a Penalty Phase

Before the penalty phase of the trial began, defendant moved to not have a penalty phase.  He argued that because his accomplice Henry Glover, Jr., was more likely the actual killer of Francia Young and had received a sentence of life without the possibility of parole, it would be arbitrary and capricious and a violation of his federal constitutional rights under the Eighth and Fourteenth Amendments if he were to be sentenced to death

35

for his role in the murder, and therefore he should not be subjected to a penalty phase in his trial.[8]  Later, in his postverdict motion to modify the jury's death verdict, defendant again argued that the imposition of the death penalty on him would be unconstitutional in light of Glover's lesser sentence.  The trial court denied that motion as well.

Defendant contends that, in light of Glover's sentence of life without the possibility of parole, both the California and federal Constitutions preclude the imposition of the death penalty on him.  We disagree.

As we recently observed, this court has repeatedly held that evidence of the *sentence* a coparticipant receives for his or her role in the offense is irrelevant to the jury's consideration of the appropriate sentence for the defendant before it.  (*People v. Moore* (2011) 51 Cal.4th 1104, 1141-1142 (*Moore*).)  Because evidence of a coparticipant's sentence is not relevant to a jury's penalty decision, Glover's sentence does not, under either the federal Constitution or state Constitution, as a matter of law preclude defendant from being sentenced to death for his role in the murder of Francia Young.  As we have explained, "[p]roperly understood, intracase proportionality review is 'an examination of whether defendant's death sentence is proportionate to his *individual* culpability, irrespective of the punishment imposed on others.' "  (*People v. Hill* (1992) 3 Cal.4th 959, 1014 (*Hill*).)[9]

---

**8**      As mentioned earlier, a jury twice deadlocked in the consideration of the appropriate penalty for Glover, and the prosecution elected not to try the penalty phase a third time.

**9**      Misplaced is defendant's reliance on cases (see *People v. Ochoa* (1998) 19 Cal.4th 353, 478 (*Ochoa*); *People v. Avena* (1996) 13 Cal.4th 394, 447) in which we rejected claims of disproportionality based on our evaluation of the defendants' *culpability* without explicit mention of the irrelevancy of the coparticipants' sentences.  Those decisions evaluated proportionality of *the defendant's* culpability.

36

To the extent defendant's appellate claim calls on us to evaluate the proportionality of his sentence to his crime, there has been no constitutional failing. Considering defendant's personal culpability in these brutal and horrific crimes (even accepting the premise that Glover was the "leading actor" and actually fired the fatal shot), as well as the mitigating and aggravating evidence before the jury, including defendant's willing participation in what appeared to be an attempt to commit a similar attack on another woman several days later, we conclude that "[d]efendant's punishment is proportionate to *his* crime." (*Hill*, *supra*, 3 Cal.4th at p. 1014; see *Graham v. Florida* (2010) 560 U.S. ___, ___ [130 S.Ct. 2011, 2021]; *In re Lynch* (1972) 8 Cal.3d 410, 424 [a sentence violates the California constitutional prohibition of cruel and unusual punishment only if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity"].)

## B. Admission of Victim Impact Evidence

Defendant contends the trial court violated his constitutional rights to a fair and reliable penalty determination by allowing Francia Young's mother to testify about "Francia's characteristics not apparent at the time of the incident, burial arrangements, her own grief, losses, and debts from grief therapy." Defendant, quoting language from an earlier separate opinion, asserts that victim impact evidence presented in a capital trial must be limited to "those facts or circumstances either known to the defendant when he or she committed the capital crime or properly adduced in the proof of the charges adjudicated at the guilt phase." (*People v. Fierro* (1991) 1 Cal.4th 173, 264 (conc. & dis. opn. of Kennard, J.).) That limitation, however, has not been accepted by this court and is not now the law. (*People v. Pollock* (2004) 32 Cal.4th 1153, 1183; see *People v. Zamudio* (2008) 43 Cal.4th 327, 368 [" 'evidence that close friends and relatives of the victims suffered emotional trauma as a result of their deaths [is] permissible victim impact testimony' "]; *People v. Boyette* (2002) 29 Cal.4th 381, 445, & fn. 12.)

Defendant also contends the admission of the testimony of family friend Ely Gassoway violated the trial court's order limiting victim impact witnesses to family members. The trial court, however, implicitly revisited its pretrial order concerning the permissible penalty phase witnesses when it later indicated that family members and close family friends would be permitted to testify as the court had allowed in Glover's trial. The prosecutor stated he intended to call the same two witnesses who testified at Glover's trial, which included Gassoway, and defendant did not object to his testifying. Defendant therefore forfeited this claim, and, in any event, Gassoway's testifying did not violate the trial court's final order. We also observe that "[t]he United States Supreme Court has not restricted the admissibility of victim impact evidence to relatives . . . ." (*People v. Marks* (2003) 31 Cal.4th 197, 235.)

### C. Exclusion of Defense Evidence

Defendant contends the trial court abused its discretion and violated his constitutional rights to a fair and reliable penalty determination by excluding testimony that his mother had been sexually molested by her father and stepbrother when she was a child, and that she had attacked her stepbrother with a knife when she discovered him sexually molesting her stepsister. The trial court did not err.

First, to the extent defendant contends that a trial court is constitutionally compelled to permit the admission of any and all assertedly mitigating evidence offered by the defendant in a capital trial, he is mistaken. "While it is true, as defendant contends, a capital defendant must be allowed to present all relevant mitigating evidence to the jury [citations], the trial court determines relevancy in the first instance and retains discretion to exclude evidence whose probative value is substantially outweighed by the probability that its admission will create substantial danger of confusing the issues or misleading the jury." (*Fauber*, *supra*, 2 Cal.4th at p. 856.)

38

Second, the trial court here did not abuse its discretion by excluding the evidence at issue. Defendant did not offer percipient witnesses who could have testified that the incidents actually occurred. His offer of proof was that his psychological expert witness would testify that other people had reported these events to him, and the expert had then considered this hearsay in arriving at his opinions concerning defendant's mother's background and parenting skills, and how these factors might have affected defendant's development. The trial court ruled that the expert could discuss in general terms the abuse and violence defendant's mother had encountered, but that the admission of more specific details about particular incidents would present an undue risk of misleading and confusing the jury by detracting from focusing on *defendant's* background and character. (See, e.g., *Ochoa*, *supra*, 19 Cal.4th at p. 456 ["sympathy for a defendant's family is not a matter that a capital jury can consider in mitigation"].) Defendant fails to explain how *his expert's opinion* would have carried any more weight with the jury had this witness been able to recount the specifics of the hearsay reports he had received about defendant's mother's background, rather than just the general descriptions of her abusive and violent upbringing. The jury was aware that defendant's mother had been severely abused and had suffered from bad parenting, which she then repeated in her treatment of defendant. In these circumstances, the trial court did not abuse its discretion in finding that the probative value of the proffered hearsay testimony was substantially outweighed by the risk of misleading and confusing the jury.

## D. Asserted Prosecutorial Misconduct During Argument to the Jury

Defendant contends the prosecutor committed misconduct during his penalty phase closing argument to the jury in four ways: (1) using derogatory terms to describe defendant; (2) appealing to the jurors' passions and prejudices; (3) commenting on defendant's failure to testify; and (4) arguing that evidence presented by the defense in mitigation constituted aggravating evidence.

39

Defendant first complains that the prosecutor referred to him as a "predator of the women of Alameda County," a "predator," a "depraved predator," a "vile, nasty predator of women," a "hyena," a "sociopath," and a "walking cancer" that should be culled from society by imposition of the death penalty. Defendant, however, forfeited these claims by not objecting at trial to any of these comments. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072.) His assertion that his objection would have been futile is without merit. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 727 ["The prevalence of asserted misconduct raised for the *first time on appeal* cannot establish that, had defense counsel made proper objections at trial, the trial court would have consistently overruled those objections, the prosecutor would have persisted in engaging in the asserted misconduct, or the jury would have been alienated by defendant's bringing the prosecutor's asserted improprieties to the court's attention."].) In any event, there was no misconduct because the prosecutor's descriptions of defendant constituted permissible "opprobrious epithets warranted by the evidence." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1172.)

Defendant next claims the prosecutor improperly appealed to the jurors' passions and prejudices. In support, he cites the prosecutor's statements that defendant would always be a "walking time bomb," and would "continue his marauding ways" in prison if sentenced to life without the possibility of parole, because he would not get therapy in prison and the authorities could not punish him by additional imprisonment, but could only attempt to deter misconduct by denying him recreational privileges, such as watching television and playing basketball. Defendant further identifies as misconduct the prosecutor's statements that the jury represented the "conscience of this community," and whether the community (through the jury) should show mercy on defendant. Finally, defendant points to the prosecutor's suggestion that the jury "send a message" through its verdict.

" 'Unlike the guilt determination, where appeals to the jury's passions are inappropriate, in making the penalty decision, the jury must make a moral assessment of

all the relevant facts as they reflect on its decision. [Citations.] Emotion must not reign over reason and, on objection, courts should guard against prejudicially emotional argument. [Citation.] But emotion need not, indeed, cannot, be entirely excluded from the jury's moral assessment.' [Citation.]" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1418.)

Defendant did not object to the prosecutor's comments regarding defendant's future dangerousness in prison on the ground that the argument was an improper appeal to emotion. He objected only to the prosecutor's comments about the absence of therapy in prison and the privileges he might have as a prisoner on the ground that there was no evidence in the record on these subjects.[10] Defendant therefore forfeited the claim he has raised on appeal. In any event, the prosecutor's comments were not so improper that they were likely to cause the jurors' emotions to reign over their reason. (See *People v. Ervin* (2000) 22 Cal.4th 48, 99.)

Defendant's objections to the comments regarding the jury serving as the conscience of the community and sending a message were sustained and the trial court directed the jury to disregard them. Defendant failed to preserve for appeal the argument that the trial court's admonitions were not understandable and strong enough. He did not request that the court issue clearer and more forceful admonitions at trial when it could have done so. Moreover, he was not prejudiced. The court's rulings would have been understood as indicating it had determined the prosecutor's comments were improper and the jurors were required to ignore them. In addition, contrary to the trial court's ruling, it

---

**10** The trial court, in fact, sustained the objection concerning the absence of therapy, and admonished the jury to disregard the comment. Defendant did not object when the prosecutor reframed the assertion as "rehabilitation is not going to occur." The trial court overruled the objection to the comment regarding recreation privileges.

41

was not improper for the prosecutor to refer to the jury as serving as the conscience of the community. (*People v. Ledesma* (2006) 39 Cal.4th 641, 741.)

Defendant next contends the prosecutor committed misconduct under *Griffin v. California* (1965) 380 U.S. 609, 612. The prosecutor, responding to the defense's attempt to raise doubt that defendant participated in the attempted abduction of Constance Silvey-White, commented on the lack of any alibi evidence, when he remarked that "[n]ot one person came forward" to say defendant "couldn't have done it, he was with me."

We conclude the trial court properly overruled defendant's *Griffin* objection. "In *Griffin*[, *supra*,] 380 U.S. 609, the United States Supreme Court held that the prosecution may not comment upon a defendant's failure to testify in his or her own behalf. Its holding does not, however, extend to bar prosecution comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses." (*Bradford*, *supra*, 15 Cal.4th at p. 1339.) As we explained, "we have held that a prosecutor may commit *Griffin* error if he or she argues to the jury that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided *only* by the defendant, who therefore would be required to take the witness stand." (*Bradford*, at p. 1339.) Here, the prosecutor's comments were framed in terms of the failure to call some person *other than defendant* who would testify that defendant "was with me." (*Bradford*, at p. 1340; see also *People v. Brady* (2010) 50 Cal.4th 547, 565-566; *People v. Brown* (2003) 31 Cal.4th at 518, 554.)

Finally, defendant contends the prosecutor twice improperly argued that evidence presented by the defense in mitigation was aggravating evidence. A prosecutor is not permitted to introduce aggravating evidence that does not fall within the listed statutory aggravating factors (*People v. Boyd* (1985) 38 Cal.3d 762, 772-776); nor may a prosecutor argue that the defense's mitigating evidence of circumstances that extenuate the gravity of the crime (§ 190.3, factor (k)) should be "used affirmatively as a

circumstance in aggravation" (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1033; see also *People v. Young* (2005) 34 Cal.4th 1149,1219 (*Young*)). The prosecutor may, however, present evidence not within the statutory aggravating factors to rebut the defendant's mitigating evidence and is permitted to argue to the jury that the defendant's mitigating evidence "fails to carry extenuating weight when evaluated in a broader factual context." (*People v. Hawthorne* (2009) 46 Cal.4th 67, 92.)

Defendant argues the prosecutor improperly commented that although defendant had experienced a "rotten, lousy, abusive childhood," the testimony at trial showed that "the bottom line is . . . he knows right from wrong, and . . . he chose to do wrong." Defendant failed to object and therefore forfeited his challenge. (*People v. Murtishaw* (1989) 48 Cal.3d 1001, 1034.) In any event, these statements were not improper. The statements were limited to rebutting the mitigating effect of the evidence of defendant's background by drawing the jury's focus to a larger factual context that despite the negative aspects of defendant's background, he chose to participate in his criminal acts and therefore should be held accountable for his conduct. (See *Young*, *supra*, 34 Cal.4th at pp. 1219-1220.)

Defendant next argues the prosecutor improperly referred to the defense expert witness's opinion that a person who endured an abusive upbringing such as defendant's was likely to be a "ticking time bomb" until the psychological harm of such a background could be addressed as establishing that defendant "would be a walking time bomb forever," and therefore would continue to pose a danger to others if he was sentenced to life without the possibility of parole. Defendant failed to preserve this claim of misconduct. Defendant's only objection to this portion of the argument was to the prosecutor's accompanying statements that defendant would not receive therapy in prison as "beyond the record [because there] is no evidence of that," and the statement that prison authorities could only "take away his color TV or his tape recorder or restrict his basketball or weight room privileges," as improper because "there is . . . no evidence in

the record of this." Defendant did not call to the trial court's attention the claim that the prosecutor was purportedly using mitigating evidence as an aggravating circumstance. There also is no merit to defendant's assertion that his pretrial motion to federalize his objections was sufficient to preserve an entirely different basis of error than that which he raised during trial. The claim, therefore, is forfeited.

### E.  Asserted Instructional Error

Defendant presents a number of challenges to the trial court's penalty phase instructions to the jury. He first contends the trial court erred in failing on its own motion to give the jury the standard instructions on consideration of direct and circumstantial evidence, sufficiency of circumstantial evidence to prove facts, and weighing of conflicting testimony. (CALJIC Nos. 2.00, 2.01, 2.22.) We agree that because the trial court instructed the jury that it was to disregard the guilt phase instructions, the court erred in failing to give these instructions during the penalty phase. (*People v. Lewis* (2008) 43 Cal.4th 415, 535; *People v. Carter* (2003) 30 Cal.4th 1166, 1219-1222.) Nonetheless, as we have concluded in similar circumstances, these errors were harmless under both the reasonable possibility standard for errors of state law (*People v. Gonzalez* (2006) 38 Cal.4th 932, 960-961) and the beyond a reasonable doubt standard for federal constitutional error. Defendant does not present any argument in support of a conclusion that these errors were prejudicial. (See *Lewis*, at p. 535 [declining to assume, based on the defendant's speculation, "that the jurors would have felt free to evaluate the penalty phase evidence in a vacuum, rather than carefully and deliberately, as they apparently had evaluated the guilt phase evidence"]; *Carter*, at pp. 1220-1221; see also *People v. Wilson* (2008) 43 Cal.4th 1, 28-29.)[11]

---

[11]  Defendant briefly argues that all the instructional errors he raises on appeal together constituted "structural" error warranting reversal of the penalty verdict even in the absence of proof of prejudice, and, in the alternative, that other asserted instructional

*(footnote continued on next page)*

44

Defendant next challenges the trial court's modification of CALJIC No. 2.90 defining the concept of reasonable doubt as it related to defendant's prior criminal activities as aggravating factors. The trial court removed from the instruction the provision that the jury should apply a presumption of innocence.[12] As defendant acknowledges, we have previously rejected the contention that this modification violates the federal Constitution. (*People v. Prieto* (2003) 30 Cal.4th 226, 262-263.) Defendant presents no compelling reason for us to reconsider this holding. (See *People v. Virgil* (2011) 51 Cal.4th 1210, 1277-1279.)

Finally, defendant contends the trial court erred by denying defendant's request to delete from CALJIC No. 8.85 assertedly inapplicable factors — factor (e), regarding the victim being a willing participant in the homicidal act, and factor (f), regarding a moral

---

*(footnote continued from previous page)*

errors (the failure to instruct on the presumption of innocence and the allocation of the burden of proof) were prejudicial. The errors in the trial court's failure to give instructions concerning these general principles of law to the jury are not structural, as evidenced by our having concluded that similar errors were harmless in *Lewis*, *Carter* and *Wilson*. And, as we will discuss, the asserted errors defendant conclusorily argues were prejudicial are not errors.

[12] The instruction was as follows: "The following instruction applies to proof beyond a reasonable doubt as it relates to alleged aggravating factors as set forth in these instructions. [¶] Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

The court's instruction deleted the first paragraph of the standard CALJIC No. 2.90 instruction: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether [his or her] guilt is satisfactorily shown, [he or she] is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving [him or her] guilty beyond a reasonable doubt."

45

justification for defendant's conduct.  Again, as defendant acknowledges, we have repeatedly held that it is not error for the trial court to refuse to omit sentencing factors that the defendant claims are inapplicable in his or her case, and we see no reason to revisit that conclusion.  (See *Davis*, *supra*, 46 Cal.4th at p. 624; *People v. Miranda* (1987) 44 Cal.3d 57, 104-105.)

## V.  POSTTRIAL ISSUES

### A.  Denial of Motion to Modify the Verdict

Defendant contends the trial court abused its discretion in ruling on defendant's motion under section 190.4, subdivision (e), to modify the death verdict.  He asserts that the court "failed to consider the case-in-mitigation because the evidence did not extenuate the gravity of the crimes," and therefore "the court did not reweigh the aggravating and mitigating circumstances as required by the statute."  Defendant argues that the court's use during its ruling of the word "extenuate" with regard to the mitigating evidence, such as its statement that "there were no circumstances presented which extenuate the gravity of the crime, whether or not it be a legal excuse," indicates the court believed a causal connection between the mitigating evidence and the crime was required.  Defendant also takes issue with the court's statement that it had considered defendant's age and found "this is not a mitigating factor," because, defendant asserts, his youth "is indeed a mitigating circumstance."

Defendant did not object to what he now perceives are the erroneous aspects of the trial court's ruling on the motion to modify the verdict, and therefore he has forfeited his claims.  (*People v. Wallace* (2008) 44 Cal.4th 1032, 1096 (*Wallace*).)  In any event, defendant's parsing of the court's ruling does not convince us the trial court misunderstood its "duty under section 190.4, subdivision (e), to independently review the evidence and determine whether it supported the jury's findings."  (*Ibid.*)  The court's comments that the mitigating evidence did not extenuate the gravity of the crime clearly

46

meant that in independently weighing the aggravating and mitigating circumstances of the case, the court found that the aggravating factors predominated. Similarly, the court's statement that defendant's age was not a mitigating factor is reasonably interpreted as a finding that his youth, when weighed with all the other evidence, did not compel a finding that the jury's verdict was contrary to the law or evidence. The court acknowledged its "duty to review the evidence to determine whether in [its] independent judgment the weight of the evidence supports the jury verdict," and stated its finding that "[c]onsidering all of the evidence and by independent review, the Court's assessment is that the factors in aggravation are so substantial when compared to the factors in mitigation that death is warranted and not life without possibility of parole." We therefore reject defendant's claim that the court abused its discretion. (See *id.* at pp. 1096-1097.)

### B. General Challenges to California's Death Penalty Law

Defendant raises a number of challenges to California's death penalty law that, as he acknowledges, we have previously rejected. He presents no compelling reason for us to reconsider those decisions. As we stated in *Wallace*, *supra*, 44 Cal.4th at page 1097:

"California's death penalty law adequately narrows the class of murderers eligible for the death penalty. [Citation.]

"Factor (a) of section 190.3, which permits the jury to consider the 'circumstances of the crime' in determining whether to impose the death penalty, is not unconstitutionally arbitrary or capricious. [Citations.]

"Neither the federal nor the state Constitution, nor any recent decision of the United States Supreme Court, requires that a jury find beyond a reasonable doubt that death is the appropriate punishment, or that it must unanimously agree on the presence of a particular aggravating factor, and none of them prohibits a jury from imposing the death penalty unless it finds beyond a reasonable doubt that the circumstances in aggravation

47

outweigh those in mitigation. Nor does the federal or state Constitution require the trial court to so instruct the jury. [Citations.]"

Similarly, the use of unadjudicated criminal acts as aggravating evidence in the absence of a requirement of juror unanimity does not violate the federal Constitution. (*People v. Carey* (2007) 41 Cal.4th 109, 137 (*Carey*).)

The jury is not required to issue written findings concerning the aggravating and mitigating evidence. (*Carey*, *supra*, 41 Cal.4th at p. 137.)

The use of terms such as "extreme" and "substantial" in the standard jury instructions regarding the mitigating factors does not impermissibly limit a defendant's ability to present mitigating evidence. There is no requirement that the jury be instructed that mitigating factors can only be considered in mitigation. (*Carey*, *supra*, 41 Cal.4th at p. 137.)

"Because capital defendants are not similarly situated to noncapital defendants, the absence in California's death penalty law of certain procedural rights provided to noncapital defendants does not violate equal protection." (*Moore*, *supra*, 51 Cal.4th at p. 1146.)

"[T]he federal Constitution does not require intercase proportionality review." (*Carey*, *supra*, 41 Cal.4th at p. 137.)

" 'International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements.' [Citation.] Defendant's claim that the death penalty is imposed regularly as a form of punishment in this state 'is a variation on the familiar argument that California's death penalty law does not sufficiently narrow the class of death-eligible defendants to limit that class to the most serious offenders, a contention we have rejected in numerous decisions.' [Citations.]" (*Carey*, *supra*, 41 Cal.4th at p. 135.)

### C.  Cumulative Prejudice

Defendant contends the guilt and penalty phase errors he has raised, when considered cumulatively, require reversal of his convictions and death sentence even if the errors are not prejudicial when considered individually.  As discussed *ante*, we have concluded that those errors we have found or assumed to exist for the sake of argument are harmless.  Even if considered cumulatively, such errors did not deny defendant a fair trial.

### VI.  DISPOSITION

We affirm the judgment.


KENNARD, J.


WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

**CONCURRING OPINION BY WERDEGAR, J.**


The majority concludes that the trial court's ruling allowing the prosecution to pursue the firearm personal-use allegations against defendant Keith Tyson Thomas and to argue defendant was the actual killer was harmless beyond a reasonable doubt. (Maj. opn., *ante*, at p. 27.) Assuming arguendo the ruling was erroneous, I agree.

I write separately to explain that my concurrence is with the understanding that nothing in the majority's discussion of this issue suggests the prosecutor in this case committed misconduct, either in charging defendant with personal use of a firearm or arguing he was the shooter. "[T]he prosecutor has the discretion to decide which offenses to charge. The courts do not generally supervise these 'purely prosecutorial function[s].' " (*People v. Ceja* (2010) 49 Cal.4th 1, 7; see also *Hambarian v. Superior Court* (2002) 27 Cal.4th 826, 840 ["the prosecutor . . . has broad discretion over . . . the decisions of whom to charge and what charges to bring . . ."].) "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." (*Bordenkircher v. Hayes* (1978) 434 U.S. 357, 364.)

Although arguing inconsistent theories of culpability can be prosecutorial misconduct if pursued in bad faith (*In re Sakarias* (2005) 35 Cal.4th 140, 159),

1

such as when the change in theories is based on a "deliberate manipulation of the evidence" (*id*. at p. 156), no such bad faith is suggested here.  Because the evidence suggests there was only one shooter, when Glover's jury in his trial failed to sustain the alleged firearm use enhancement the People could fairly conclude—and argue to defendant's jury—that defendant was the shooter.

      With that minor caveat, I concur.

**WERDEGAR, J.**

**I CONCUR:**

**CORRIGAN, J.**

2

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Thomas
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S067519
**Date Filed:** July 23, 2012
_____

**Court:** Superior
**County:** Alameda
**Judge:** Alfred A. Delucchi

_____

**Counsel:**

David Joseph Macher, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Bruce Ortega, Amy Haddix and Donna M. Provenzano, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

David Joseph Macher
25060 Hancock Avenue
Murrieta, CA  92562
(951) 259-3789

Donna M. Provenzano
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-1303