Filed 7/2/15  P. v. Parker CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY PARKER et al.,<br><br>   Defendants and Appellants. | B251525<br><br>(Los Angeles County<br>Super. Ct. No. BA329920) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Kennedy, Judge.  Affirmed.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant Anthony Parker.

Alison Minet Adams for Defendant and Appellant Kurt August.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Codefendants Anthony Parker and Kurt August separately appeal the judgments following their convictions for first degree premeditated murder, raising various challenges to their convictions. We find no prejudicial error and affirm.

## PROCEDURAL HISTORY

Appellants were charged with the murder of Thomas Rankin (Pen. Code, § 187, subd. (a)),[1] along with gang enhancements (§ 186.22, subd. (b)(1)(C), (4)) and firearm enhancements (§ 12022.53, subds. (b), (c), (d), (e)(1)). It was also alleged August had two prior "strike" convictions (§ 667, subds. (b)-(i)), two prior serious felonies (§ 667, subd. (a)(1)), and three prior prison terms (§ 667.5, subd. (b)). A first jury trial ended in a mistrial. After a second trial, the jury found appellants guilty of first degree premeditated murder and found the enhancements true. Parker was sentenced to 50 years to life in state prison, consisting of 25 years to life for the first degree murder and 25 years to life under section 12022.53, subdivision (d). August admitted his prior convictions and was sentenced to 105 years to life, consisting of 75 years to life for the first degree murder as a third strike offender, 25 years to life under section 12022.53, subdivision (d), plus 5 years under section 667, subdivision (a). Appellants timely appealed.

## STATEMENT OF FACTS

The shooting in this case occurred late in the evening of August 27, 2007, in Los Angeles. Around 9:30 p.m., Los Angeles Police Officer Edgar Ramos ran a warrant check on a blue 1990's Chevrolet Tahoe he passed while driving eastbound on 57th Street near Gramercy Place. August was the driver and registered owner of the vehicle. About 10:00 p.m., Kia Nichols was outside on Gramercy Place near 57th Street with her cousins Destiny Williams and Dornice Washington, and victim Rankin. Nichols, Williams, and Rankin all grew up on the same block. As they stood outside talking, Nichols noticed a blue Tahoe pass by three times. Each time, it traveled northbound on Gramercy Place and turned westbound onto 57th Street. She saw the driver each time, and at trial she identified him as August. She also saw someone in the backseat.

---

[1]     Undesignated statutory citations are to the Penal Code unless otherwise noted.

After the third time the vehicle passed, Nichols saw a tall, thin African-American man approaching her and her friends on Gramercy Place from 57th Street, the direction she had last seen the Tahoe turn. She got a good look at him from one or two feet away and identified him at trial as Parker. He was wearing a black hoodie, blue jeans, and black and white Adidas shoes. Nichols kept her eye on him because she had never seen him before and it was unusual to have a stranger walk down that street late at night. When Parker reached the group, he said, "Hello." Washington asked Parker if he was "from around here." Parker said no. Washington told the others to run. Parker then held up two fingers as if he were signaling a peace sign, pulled a gun from his waistband, and began shooting. Nichols and Williams ran. They saw and heard six or seven shots. Nichols hid behind a car across the street and saw Parker continue to shoot at Williams and Washington. Williams hid behind another car across the street, and its windows got shot out. Rankin lay on the ground where Parker first started shooting.

After the shooting, Parker ran down Gramercy Place toward Slauson Avenue. Nichols ran into her house. Rankin was on the ground bleeding and shaking.

At 10:00 p.m. that night, Michael Lyday was working for the City of Los Angeles's sewer maintenance department located near the intersection of Slauson Avenue and Gramercy Place. He was outside on Gramercy Place when he heard gunshots and a woman scream. He saw a tall, slender, dark-complected person run past him on Gramercy Place and turn onto Slauson Avenue. The man was holding something in his left pocket. The man jumped into a blue or green Tahoe or Suburban, which went westbound on Slauson Avenue and turned north onto Van Ness Avenue.

Police officers responded to the scene and found Rankin in the street not moving or breathing and surrounded by about eight visibly upset people. Rankin was on the west side of the street and they found a car on the east side with its windows shattered and what appeared to be a bullet hole in the glass. That night, Nichols gave descriptions of the driver and shooter.

An autopsy revealed Rankin was shot three times—once in the back of head, once in the back just below his scapula, and once in the back of his right arm. The shots to his head

3

and back were each fatal. There was no indication of stippling or burn marks, which typically are not seen if a person is shot from a distance greater than three feet.

On September 17, 2007, Nichols was shown a six-pack photographic lineup and identified August in position No. 4 as the driver of the blue Tahoe. Two days later, she was shown another six-pack photographic lineup and identified Parker in position No. 4 as the shooter, writing "Killed my friend, number four." Later at the preliminary hearing, however, Nichols testified she did not see either the shooter or the driver in the courtroom. At a prior hearing (presumably the first trial) and again at trial, she identified both Parker and August. She explained that before the preliminary hearing she realized she had attended middle school with Parker, although she denied that had "freak[ed]" her out.

On September 21, 2007, Williams was shown a six-pack photographic lineup and selected the photograph in position No. 4 as looking like the shooter, writing "Number four looked like the person who shot and killed my friend." Williams was unable to identify Parker at trial.

Nichols and Williams were later shown a six-pack photographic lineup containing a photograph of a person of interest named Nicholas Grunitzky, but they did not identify anyone.

Los Angeles Police Officer Jesse Murphy testified as a prosecution gang expert. He had extensive knowledge of the Rolling Thirties Harlem Crips (Rolling Thirties) gang and explained that, as of 2007, the Rolling Thirties had approximately 800 documented members and the gang's primary activities were narcotic sales, theft, robbery, shootings, murder, assault with a deadly weapon, and witness intimidation. He was personally familiar with appellants and opined they were both members of the Rolling Thirties gang based on their gang tattoos, gang attire, personal contacts, and associations with other gang members, among other factors. Parker had the moniker of "Tiny Yak" and Officer Murphy believed he had started the "Hot Heads" subclique within the gang. August's moniker was "Three Fingered Louie." On September 7, 2007, Officer Murphy had stopped appellants in a Ford Winstar Van with Tyshawn Lewis and Nicholas Grunitzy, both of whom were Rolling Thirties gang members. August was about 35 years old while the others were in their 20's.

4

Officer Murphy explained an older gang member would act as a mentor and guide younger members through gang life and gang culture. He testified to two predicate criminal convictions for other gang members: a 2007 possession of a firearm and a 2005 theft.

Officer Murphy explained Rolling Thirties members would go into other gang territories to commit crimes to enable younger members to gain respect, given the danger involved. The shooting in this case occurred in an area claimed by the Van Ness Gangsters, a rival gang of the Rolling Thirties. Given a hypothetical tracking the facts of this case, Officer Murphy opined the shooting in this case was for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, or assist criminal conduct by that gang. He explained driving by the location several times demonstrated the gang members were scouting the area, and the older gang member driving the vehicle would have been mentoring and vouching for the younger member. The shooting would also have created fear in rivals and increased the gang's reputation.

Neither appellant testified. Parker called an identification expert, who testified to potential problems with Nichols's and Williams's identifications. First, Nichols's identification of Parker from the six-pack photographic lineup was unduly suggestive because the detective told Nichols to focus on Nos. 3 and 4 after she had eliminated the other four photographs. Second, Nichols's six-pack photographic identification of Parker was dated September 19, 2007, although she signed it on September 21, 2007, because she had failed to sign it initially. The expert believed the detective should have noted that on the identification itself and should have more thoroughly explained the situation in the followup report. Third, both Nichols and Williams signed their six-pack identifications at the same time on September 21, 2007, in the same house. Finally, both appellants were in position No. 4 in the six-pack lineups, which violated police department training.

### 1. *Juror Misconduct*

Appellants each argue the trial court abused its discretion by denying their request to subpoena jurors and by denying a motion for a new trial when a suggestion of juror misconduct arose following the verdicts. We disagree.

### A. *Proceedings*

The jury began deliberating on Thursday, May 3, 2012, and continued throughout the day on Friday, May 4, 2012. When the jury returned on Monday morning, May 7, 2012, to continue deliberating, Juror No. 9 called and informed the court she could not come in because she was suffering from a migraine headache, anxiety, and lack of sleep. She produced a doctor's note indicating she was disabled from returning for jury duty, so the court dismissed her and replaced her with an alternate juror. After about two and a half hours of deliberating, the newly constituted jury reached its verdicts.

The next day the courtroom bailiff received a call from a woman identifying herself as the wife of Juror No. 2. She stated her husband was upset with the jury's verdict and he was "pressured into" changing his vote to guilty by the other jurors so they could go home. She also stated other jurors may have pressured Juror No. 9 into changing her vote before she was medically unable to finish her jury service.

Two weeks later, Parker filed a motion for release of juror information or, in the alternative, for a new trial based on Juror No. 9's medical excusal, the fact that deliberations were short after Juror No. 9 was replaced, the phone call from Juror No. 2's wife, and the fact that Juror No. 6 cried when the verdicts were read. The prosecution opposed, arguing Parker failed to show good cause to release juror information because Juror No. 2's wife's statements were hearsay and none of the incidents cited by Parker showed juror misconduct.

On July 19, 2012, Juror No. 2 came into court and indicated he was willing to speak to the attorneys. The court did not believe grounds existed to disclose juror information, but

---

**2** Parker did not join any of August's arguments. August joined Parker's challenge to the jury instructions and explained why it would benefit him, so we will consider that argument as to him. (See *People v. Bryant* (2014) 60 Cal.4th 335, 363.)

the parties could pursue the matter after speaking with Juror No. 2. Juror No. 2 was thereafter interviewed. Based on information he provided, Parker filed an additional motion for release of juror information or for a new trial, renewing the prior grounds of misconduct and adding that, according to Juror No. 2, Juror No. 1 brought in outside information that his friend told him what the peace sign made by Parker could mean, and Juror No. 2 was placed under undue pressure to change his vote to guilty.

August also filed a motion for an order to release juror information and/or an evidentiary hearing premised on the following grounds: (1) Juror No. 11 brought in outside information on the meaning of the peace sign flashed by Parker; (2) Juror Nos. 1 and 9 discussed guilt outside the presence of the entire jury; (3) Juror No. 12 failed to reveal during voir dire that he had been a victim of gang violence; (4) Juror No. 9 voted guilty out of sympathy for the victim; and (5) Juror No. 11 disregarded the evidence because she was in a hurry to begin her vacation.

In its response to Parker's motion, the prosecution did not oppose the court setting a hearing regarding whether extraneous information was discussed, but argued none of the other grounds revealed by Juror No. 2 constituted good cause to reveal juror information.

At a hearing on the motions, the court indicated it had notified the jurors and had heard from nine of them, all of whom opposed having their identities revealed. The court felt many of Juror No. 2's statements in his interview were ambiguous, unclear, and the interview itself constituted hearsay, so the prosecution had the right to cross-examine Juror No. 2 under oath.

At a subsequent hearing, Juror No. 2 testified under oath. On direct examination, he explained that after he voted guilty, he felt upset because, as one of two holdout jurors, he felt pressure from other jurors to vote guilty. It was getting "nasty" in the jury room and he did not want to be there anymore. He felt he was not "strong enough" and the other jurors broke him down by making him feel dumb. He said they wanted to leave and one juror had to leave on vacation. Had he not received the pressure, he would have kept his not guilty vote. He also said an Asian juror brought in outside information when he explained he got some information from African-American friends that the peace sign made by Parker meant

7

"fuck off" or something similar. Other jurors responded, "Oh, that's correct. It could be true." But Juror No. 2 stepped in and said that kind of information could not be brought in. He believed the information affected the outcome of the case. The information was not brought up again when Juror No. 9 was excused and an alternate appointed. Juror No. 2 also testified Juror No. 11 or 12 was biased against gang members based on past experience being robbed by gang members.

On cross-examination, Juror No. 2 explained the juror discussing the peace sign brought the information in for only 10 or 15 seconds and he did not urge the other jurors to use it. Juror No. 2's own vote was not affected. Juror No. 2 affirmed his guilty vote when polled after the verdict was read because it was his first time on a jury and he did not know how to ask for help. He also believed two of the jurors were biased against appellants because appellants were gang members.

On redirect examination, Juror No. 2 testified one of the jurors was inclined to vote guilty out of sympathy for the victim and another juror disregarded the evidence because she had a vacation scheduled.

After hearing argument from counsel, the court denied the motions. With regard to Juror No. 9, the court noted she had asked during voir dire if medical reasons could be utilized to be excused from the jury, suggesting she might have had some medical condition from the beginning of trial. The court also noted the discussion of the peace sign occurred before Juror No. 9 was replaced and the jury did not discuss the issue when the alternate was on the jury. Juror No. 2 himself said that discussion did not change his vote and he was the one who said not to discuss outside matters, at which point the discussion ended. Further, even though Juror No. 2 felt pressure, the court explained "[i]ntrinsically there is pressure on those that . . . have a minority point of view to change their mind" and there was nothing improper about pressure during the deliberative process. There was no evidence of threats or physical violence and the extrinsic evidence did not cause Juror No. 2 to change his mind, so it appeared Juror No. 2 simply did not have the "intestinal fortitude" to hold onto his opinion. The court found the other issues raised went to the internal process of deliberation and could not be reached by a motion for jury misconduct.

8

*B. Disclosure of Juror Information*

Code of Civil Procedure section 206, subdivision (g) provides, "[p]ursuant to [Code of Civil Procedure] Section 237, a defendant or defendant's counsel may . . . petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for a new trial or any other lawful purpose. This information consists of jurors' names, addresses, and telephone numbers. The court shall consider all requests for personal juror identifying information pursuant to Section 237."

Code of Civil Procedure section 237, subdivision (b) in turn provides: "Any person may petition the court for access to [juror identification] records. The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information. The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information, but shall not set the matter for hearing if there is a showing on the record of facts that establish a compelling interest against disclosure. A compelling interest includes, but is not limited to, protecting jurors from threats or danger of physical harm. If the court does not set the matter for hearing, the court shall by minute order set forth the reasons and make express findings either of a lack of a prima facie showing of good cause or the presence of a compelling interest against disclosure."

In assessing a request for juror information, we must determine whether appellants have set forth "'a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial.'" (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 990.) We review the denial of a petition filed pursuant to Code of Civil Procedure section 237 for abuse of discretion. (*Carrasco*, at p. 991.)

We find no abuse of discretion here. Nine jurors declined to have their information disclosed, so appellants did not have a right to obtain their contact information. (Code Civ.

9

Proc., § 237, subd. (d); *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1097 [if a juror refuses to consent to be interviewed, "that is the end of the matter"]; *People v. Tuggles* (2009) 179 Cal.App.4th 339, 382 (*Tuggles*) ["[A]n objection [by a juror] precludes disclosure to the person requesting the information."].) Appellants did not need Juror No. 2's contact information because appellants already interviewed him and he testified. That left three jurors: Juror No. 9, who was dismissed; the alternate juror who replaced Juror No. 9; and one other juror who did not respond to the court's hearing notice. Appellants have not shown any misconduct with regard to Juror No. 9 because, while Juror No. 2 speculated Juror No. 9 was dismissed for medical reasons due to pressure in the jury room, the trial court observed she had asked about medical issues during voir dire long before deliberations. Also, when Juror No. 9 asked to be dismissed, she did not indicate pressure in the jury room caused her medical condition. For the remaining two jurors, appellants have not indicated which jurors they were, so there is no way for us to know whether they had any further information on the issues raised by Juror No. 2. Nor have appellants indicated what information they might have had that would add to Juror No. 2's testimony regarding any potential misconduct. Thus, appellants failed to show the release of identifying information for the three remaining jurors was necessary.[3]

*C. New Trial Motion*

That leaves Parker's motion for a new trial based on juror misconduct. Appellants argue on appeal that misconduct occurred because (1) Juror No. 2 felt pressured into changing his vote; (2) Juror No. 11 or 12 was biased against gang members based on a prior robbery he failed to disclose during voir dire; (3) the jury did not resume deliberations after Juror No. 9 was replaced; (4) Juror No. 1 consulted a Google map for the location of the crime; and (5) Juror No. 10 brought in extraneous information about the meaning of the

---

[3] For the same reasons, we reject Parker's suggestion that the court was obligated to exercise its inherent authority to subpoena the jurors to appear at the hearing. (See *Tuggles, supra*, 179 Cal.App.4th at pp. 385-386 ["[W]here the trial court is presented with a credible prima facie showing that serious misconduct has occurred, the trial court may order jurors to appear at a hearing and to answer questions about whether misconduct occurred."].)

"peace sign" Parker made just before the shooting. We find none of these circumstances demonstrated prejudicial misconduct.

Under section 1811, the trial court may grant a new trial when "the jury has received any evidence out of court, other than that resulting from a view of the premises, or of personal property" (§ 1181, par. 2), the jury has "been guilty of any misconduct by which a fair and due consideration of the case has been prevented" (§ 1181, par. 3), or when "the verdict has been decided by lot, or by any means other than a fair expression of opinion on the part of all the jurors" (§ 1181, par. 4). In reviewing a motion for a new trial, we first determine whether there has been any misconduct, and if so, whether the misconduct was prejudicial. (*People v. Collins* (2010) 49 Cal.4th 175, 242 (*Collins*).)

First, the fact that Juror No. 2 felt pressured into changing his vote is inadmissible evidence of his mental process that cannot impeach the verdict. (Evid. Code, § 1150, subd. (a) ["Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."]; *In re Hamilton* (1999) 20 Cal.4th 273, 294.)[4] But even if admissible, the pressure Juror No. 2 felt was all part of the deliberative process and there was no evidence of improper coercion. (See *People v. Thompson* (2010) 49 Cal.4th 79, 139-141 [personally attacking juror, waving photograph in juror's face, calling juror "'dumb,'" and declaring jury "'need[ed] to leave'" not misconduct]; *People v. Cox* (1991) 53 Cal.3d 618, 694-695 [intimidation of nonsmoking

---

[4]     Neither the parties nor the trial court considered whether any of Juror No. 2's testimony was inadmissible pursuant to Evidence Code section 1150, subdivision (a). Nonetheless, on review we may disregard any statements reflecting on the subjective mental processes of Juror No. 2 or any other juror. (*Collins, supra*, 49 Cal.4th at p. 249 [noting the parties did not object and the trial court did not enforce the limitation in Evid. Code, § 1150, but nonetheless limiting review "to the overt acts reflected in the [jurors'] testimony"].)

11

jurors and desire to avoid prolonged deliberations not misconduct], disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Keenan* (1988) 46 Cal.3d 478, 541 [death threat by one juror to another was an "expression of frustration, temper, and strong conviction against the contrary views of another panelist," not misconduct].) Also, as we noted above, Juror No. 2's claim that Juror No. 9's medical issues resulted from improper pressure was speculative and belied by the fact that Juror No. 9 asked about medical issues during voir dire. The trial court resolved this factual conflict against appellants and substantial evidence supported that decision, so it does not show misconduct.

Second, Juror No. 2's vague statement that Juror No. 11 or 12 was biased against gang members based on a prior robbery did not demonstrate misconduct. Neither Parker nor August provided cogent analysis on this point. In any case, there was nothing to suggest any of the jurors, including the juror who made this statement, was improperly influenced to base the verdict on anything other than the evidence. While August claims this juror failed to disclose his bias during voir dire, the voir dire transcript reveals Juror No. 11 explained that two female gang members assaulted his wife and son with a plastic knife in 1994. When questioned, he affirmed he could be fair in this case.

Third, although Juror No. 2 testified that, after Juror No. 9 was replaced, the jury did not restart deliberations, the record belies that assertion. After Juror No. 9 was replaced, the jury did not return a verdict for nearly two and a half hours, suggesting the new juror did not simply rubber-stamp a guilty verdict. Moreover, the new juror sat through the trial and was already familiar with the evidence, so he or she may not have needed to walk through every single piece of evidence to reach a guilty verdict.

Fourth, while Juror No. 2 stated during his interview with an investigator that Juror No. 1 consulted a Google map for the location of the crime, he did not repeat this claim in his testimony under oath, so his statements during the interview were inadmissible hearsay. Even if admissible, there was no prejudice because the location of the crime was uncontested and Juror No. 2 did not say Juror No. 1 brought the map into the jury room.

12

Finally, we agree with appellants that Juror No. 10 committed misconduct by bringing in extraneous information about the meaning of the "peace" sign made by Parker before the shooting, which gives rise to a presumption of prejudice. (*People v. Nesler* (1997) 16 Cal.4th 561, 578.) Respondent has rebutted that presumption, however, because the record demonstrates "'there is no substantial likelihood that any juror was improperly influenced to the defendant's detriment.'" (*People v. Gamache* (2010) 48 Cal.4th 347, 397.) According to Juror No. 2, when Juror No. 10 brought this information into the deliberations, it was discussed exceedingly briefly for 10 or 15 seconds, and the matter was dropped when Juror No. 2 said the jury should not have been discussing it. Juror No. 10 did not urge the other jurors to use the information, and Juror No. 2 himself said it did not affect his decision. Also significantly, the matter was discussed before Juror No. 9 was replaced and was not brought up again with the newly constituted jury.

Thus, appellants have failed to show prejudicial juror misconduct that would have justified granting a new trial.

## 2. Instructional Error

Joined by August, Parker claims the trial court misinstructed the jury on the intent required for the gang enhancements. We disagree.

For these enhancements, the court instructed the jury pursuant to CALCRIM Nos. 1401 and 1402. As given, CALCRIM No. 1401 stated in relevant part: "If you find the defendant guilty of the crime charged in count one or the lesser offense, you must then decide whether the people have proved the additional allegation that the defendant committed the crime . . . for the benefit of, at the direction of or in association with a criminal street gang. [¶] You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime. [¶] To prove this allegation the people must prove that, one, the defendant committed the crime for the benefit of, at the direction of or in association with a criminal street gang; and two, the defendant intended to assist, further or promote criminal conduct by gang members." CALCRIM No. 1402 related to the section 12022.53 enhancement and repeated the requirements from CALCRIM No. 1401 on the gang enhancement: "If you find the defendant guilty of the crime charged in

13

count one or the lesser crime of second degree murder and you find that the defendant committed that crime for the benefit of, at the direction of, or in association with a criminal street gang with the intent to promote, further or assist in any criminal conduct by gang members, you must then decide whether the People have proved the additional allegation that one of the principals personally used and personally and intentionally discharged a firearm during that crime and caused death."

The court also instructed the jury on general and specific intent pursuant to CALCRIM No. 252: "The following allegation requires general criminal intent[:] [¶] . . . [¶] . . . Personal discharge of a firearm causing death. [¶] For you to find the allegation true, that person must not only commit the prohibited act but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act; however, it is not required that he or she intend to break the law. [¶] The act required is explained in the instruction for that allegation. [¶] The following crime and allegations require a specific intent or mental state: murder in the first degree or murder in the second degree, as well as the enhancements that the crimes were committed for the benefit of a criminal street gang and that a principal used and discharged a firearm causing death during the crime, committed for the benefit of a criminal street gang. [¶] For you to find a person guilty of either of these crimes or to find these allegations true, that person must not only intentionally commit the prohibited act, but must do so with a specific intent. [¶] The act and the specific intent required are explained in the instruction for that crime or allegation."

Appellants claim these instructions unconstitutionally lowered the prosecution's burden of proof because CALCRIM No. 252 instructed the jury it had to find specific intent for the "benefit" element of the enhancements, while CALCRIM Nos. 1401 and 1402 omitted the word "specific" for the intent-to-promote element, which had the effect of requiring only general intent for that element.[5] In reviewing challenges to jury instructions,

_____

[5]     Respondent contends appellants forfeited this claim by failing to object in the trial court. But because the alleged misinstruction involved the elements of the enhancements

14

we must determine "whether there is a 'reasonable likelihood' that the jury understood the charge as defendant asserts." (*People v. Kelly* (1992) 1 Cal.4th 495, 525.) "[T]he correctness of jury instructions must be determined from all of the instructions given, not from a consideration of parts of an instruction or from a particular instruction. The absence of a critical element in one instruction may be supplied by another or cured by the instructions as a whole." (*People v. Lee* (1990) 220 Cal.App.3d 320, 327-328.)

Part of the potential confusion here arose from the trial court's modification to CALCRIM No. 252. That instruction directs trial courts to insert the names of offenses and enhancements that require specific intent: "The following crime[s] [and allegation[s]] require[s] a specific intent or mental state: _____ *<insert name[s] of alleged offense[s] and count[s], e.g., burglary, as charged in Count 1>* _____ *<insert name[s] of enhancement[s]>*." (CALCRIM No. 252.) The instruction further instructs "[t]he act and the specific (intent/ [and/or] mental state) required are explained in the instruction for that crime [or allegation]." (*Ibid.*) Clearly, the drafters of this instruction contemplated that courts would use shorthand labels for crimes and enhancements requiring specific intent and then define the required intent in later instructions. The trial court here followed that recommendation by using shorthand to refer to the "enhancement that the crimes were committed for the benefit of a criminal street gang" and then telling the jury that it would define the required intent in later instructions (which it did accurately, as we discuss below). Viewed in isolation, CALCRIM No. 252 might have been confusing because appellants need not specifically intend to *benefit* the gang, but only specifically intend to "'promote, further, or assist in any criminal conduct by gang members.'" (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.) But read in conjunction with the instructions defining the intent element, there was no reasonable likelihood the jury misunderstood this instruction.[6]

and may have affected appellants' substantial rights, we will review the merits. (§ 1259; *People v. Hillhouse* (2002) 27 Cal.4th 469, 503.)

[6] Of course, even if the jury misunderstood CALCRIM No. 252 as requiring specific intent for the benefit element, appellants were not prejudiced because the error arguably raised the prosecution's burden of proof.

Appellants also argue the jury was confused because the instructions based on CALCRIM Nos. 1401 and 1402 defining the intent element omitted the word "specific," while the section 186.22, subdivision (b)(1) defines the required intent as "the *specific* intent to promote, further, or assist in any criminal conduct by gang members." (Italics added.) We are not persuaded. While the inclusion of the word "specific" would have more closely tracked the language of the statute, the instructions clearly defined the statutory element as "intended to assist, further or promote criminal conduct by gang members." Given the instructions actually define the required intent, a jury would not have misunderstood this element to require only a general intent to commit the act, rather than the specific intent to promote criminal conduct by gang members. (See *People v. Atkins* (2001) 25 Cal.4th 76, 86 [language typically denoting specific intent includes "'with the intent' to achieve or 'for the purpose of' achieving some further act"].) Thus, there was no reasonable likelihood the jury would have been confused about the required intent for the gang enhancements based on these instructions.

### 3. *August's Additional Challenges*

#### A. *Sufficiency of the Evidence*

August contends insufficient evidence supported his murder conviction and the gang enhancement.[7] We disagree.

""""When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

---

[7] In the heading for this argument in his brief, August suggests there was insufficient evidence to support the firearm enhancement, but he has included no argument on this point. We therefore find the point forfeited. (*People v. Whalen* (2013) 56 Cal.4th 1, 72, fn. 28.)

16

[Citations.] "[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt." [Citation.] "In a case, such as the present one, based upon circumstantial evidence, we must decide whether the circumstances reasonably justify the findings of the trier of fact, but our opinion that the circumstances also might reasonably be reconciled with a contrary finding would not warrant reversal of the judgment.""" (*People v. Foster* (2010) 50 Cal.4th 1301, 1348.)

August was tried for murder under a direct aiding and abetting theory. An aider and abettor is someone who, "'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.'" (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.) While neither presence at the crime scene nor knowledge of the crime and failing to prevent it is sufficient to establish aiding and abetting, factors that may be considered include presence at the crime scene, companionship, and conduct before and after the offense. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) Moreover, an aider and abettor can be one who is present "'to take charge of an automobile and to keep the engine running, or to drive the "getaway" car and to give direct aid to others in making their escape from the scene of the crime.'" (*People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 744.)

August points to several alleged weaknesses in the evidence, but in doing so, he ignores the proper standard of review. Viewing the evidence in the light most favorable to the judgment, there was ample evidence to support August's murder conviction as an aider and abettor. The prosecution's gang expert Officer Murphy explained that appellants were members of the Rolling Thirties, a gang known for shootings and murder, among other crimes. As an older gang member, August would have acted as a mentor and guide for Parker, a younger gang member. And a younger gang member like Parker would have earned respect in the gang by shooting a victim in an area belonging to a rival gang. Against that background, the circumstances surrounding the shooting demonstrated a coordinated plan by appellants to identify a victim and commit murder. Nichols observed August and another passenger drive by three times in August's blue Tahoe, casing her

17

group, before Parker approached them from the direction of the Tahoe's last turn.  Parker opened fire, hitting Rankin in the head and chest.  He then fled toward Slauson, at which point he was observed getting into August's waiting Tahoe, which then drove away.  From this evidence, the jury could have readily inferred that, as fellow members of a gang known for shootings and murders, appellants planned to go into a rival gang's territory to identify a victim and commit murder and August aided in carrying out that plan by driving Parker to the location and driving him away after the shooting.

As for the gang enhancement, August argues there was insufficient evidence to show he intended to benefit the gang, but the record contains ample evidence of a gang-related motive.  The jury could have relied on Officer Murphy's gang expert testimony to find the gang enhancement true.  (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930 ["It is well settled that expert testimony about gang culture and habits is the type of evidence a jury may rely on to reach a verdict on a gang-related offense or a finding on a gang allegation."].)  His testimony provided context for the evidence that August and Parker rolled into a rival gang's territory, cased a group of potential victims, shot at them at close range, then fled together.  This evidence was sufficient to demonstrate the shooting was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).)**8**

---

**8**      August advances several constitutional challenges to section 186.22, subdivision (b), all of which have been resolved against him by our Supreme Court.  He claims section 186.22, subdivision (b) violates the First, Fifth, and Fourteenth Amendments to the United States Constitution because it permits a finding of guilt based on association alone and shifts the burden of proof to him to prove his innocence.  Our high court has repeatedly rejected the notion that section 186.22, subdivision (b)(1) punishes mere association.  (*People v. Albillar* (2010) 51 Cal.4th 47, 67-68 ["The enhancement set forth in section 186.22(b)(1) does not pose a risk of conviction for mere nominal or passive involvement with a gang. Indeed, it does not depend on membership in a gang at all."]; *People v. Loeun* (1997) 17 Cal.4th 1, 11 ["[T]he STEP Act does not criminalize group membership."]; *People v. Gardeley* (1996) 14 Cal.4th 605, 623 ["[O]ur STEP Act does not criminalize mere gang membership; rather, it imposes increased criminal penalties only when the criminal conduct is felonious and committed not only 'for the benefit of, at the direction of, or in association

*B. Suggestive Photographic Identification*

August argues his due process rights were violated when Nichols identified him in an unduly suggestive identification procedure with the six-pack photographic lineup. We disagree.

To determine whether the admission of identification evidence violates a defendant's right to due process, we consider "'"(1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances."'" (*People v. Thomas* (2012) 54 Cal.4th 908, 930; see *Perry v. New Hampshire* (2012) __ U.S. __, __ [132 S.Ct. 716, 724-725].) We review the trial court's fact and credibility determinations deferentially and independently determine whether, under those facts, the identification procedure was unduly suggestive. (*Thomas, supra*, at p. 930.) Because we find the identification procedure used with Nichols was not unduly suggestive, we need not determine whether Nichols's identification was nevertheless reliable. (*Ibid.*)

August argues only two of the six photographs shown to Nichols in the photographic lineup "remotely resembled" him and he was the only one with braids in his hair as Nichols had described them. But "'there is no requirement that a defendant in a lineup be surrounded by people nearly identical in appearance.'" (*People v. Wimberly* (1992) 5 Cal.App.4th 773, 790.) A six-pack photographic lineup is only suggestive if "'anything caused defendant to "stand out" from the others in a way that would suggest the witness

with' a group that meets the specific statutory conditions of a 'criminal street gang,' but also with the 'specific intent to promote, further, or assist in any criminal conduct by gang members.'"].) August also contends the statute requires proof of specific intent to assist criminal conduct by gang members *other* than the crimes at issue, but he acknowledges this contention was rejected in *Albillar, supra*, at page 66, which we are bound to follow. Likewise, he claims the court in *Albillar* unconstitutionally punished mere association when it held that "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Id.* at p. 68.) Again, we are bound to follow *Albillar*, so we reject his claim.

should select him.'" (*People v. Cunningham* (2001) 25 Cal.4th 926, 990.) We have reviewed the six-pack photographic lineup shown to Nichols and, while the individuals bore certain differences, August did not "stand out," suggesting Nichols should select him. All of the men in the photos were of similar age and appeared to be African-American with differing skin tones; three had braided hair similar to August's (one other man had long hair that did not appear to be braided); two had round faces and appeared heavy-set like August; and four had facial hair similar to August's. Each individual also had a black mark close to his left eye, presumably to eliminate the possibility of August standing out based on his facial tattoo.

August further argues Nichols's initial identification was undermined because she did not make a positive identification at the preliminary hearing. But Nichols testified she had realized prior to the preliminary hearing that she had attended middle school with Parker. Although she denied that had "freak[ed]" her out, the jury could have inferred she may have been uncomfortable identifying either appellant at that time. Nevertheless, by the time of trial, Nichols identified both appellants, so any inference of a suggestive photographic lineup was weak at best. August also argues Nichols did not mention August's tattoo under his eye, but that fact carries little significance because the tattoo appears to be small, and Nichols testified she did not see it as August drove his car past her at night just before the shooting. In any case, that could not have tainted her identification because all the individuals in the lineup had marks under their eyes to make their appearances uniform. Finally, August contends the detective improperly coached Nichols to focus on the photographs in position Nos. 3 and 4. But the detective made that statement while Nichols was looking at the photographic lineup for Parker, not August. Thus, August's rights were not violated by Nichols's identification of him in the photographic lineup.

## C. *Gang Expert's Testimony Based on Hypothetical*

August contends Officer Murphy improperly expressed an opinion on his guilt when he responded to a hypothetical question based on the evidence in the case that the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang. However, our high court has approved the use of hypothetical questions closely tracking the

evidence in a case to allow gang experts to express an opinion on whether a crime was committed for the benefit of a criminal street gang.  (See *People v. Vang* (2011) 52 Cal.4th 1038, 1045, 1049; *People v. Gonzalez* (2006) 38 Cal.4th 932, 946; *People v. Gardeley* (1996) 14 Cal.4th 605, 618.)  We have reviewed the hypothetical posed to Officer Murphy and find it was not improper.

*D.  Cumulative Error*

As we have found no errors, we reject August's contention cumulative error warrants reversal of his conviction.

## DISPOSITION

The judgments are affirmed.


FLIER, J.

WE CONCUR:


RUBIN, Acting P. J.


GRIMES, J.


21