Filed 9/6/23  P. v. Williams CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>MICHAEL ALAN WILLIAMS,<br><br>     Defendant and Appellant. | F084641<br><br>(Super. Ct. No. 21CR-06273)<br><br>**OPINION** |

THE COURT*

APPEAL from a judgment of the Superior Court of Merced County.  Steven K. Slocum, Judge.

Deanna L. Lopas, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Joseph Penney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*     Before Hill, P. J., Franson, J. and Meehan, J.

Defendant Michael Alan Williams limits his appeal to one specific question—whether there was error under *Doyle v. Ohio* (1976) 426 U.S. 610 during the prosecution's cross-examination of defendant questioning his postarrest silence. Defendant believes this effort by the prosecution to impeach his credibility required the trial court to grant his motion for a mistrial. Our review of the transcript of the trial, the evidence introduced at trial, and the relevant legal authorities, leads us to conclude that even if there was error, any error was harmless beyond a reasonable doubt and does not require a reversal of defendant's conviction.

## **PROCEDURAL SUMMARY**

On May 18, 2022, an amended information was filed charging defendant with inflicting corporal injury on a spouse (Pen. Code,[1] § 273.5, subd. (a), a felony; count 1) and assault with a firearm (§ 245, subd. (a)(2), a felony; count 2). During the trial of these charges, defendant was in the midst of testifying on his own behalf when the trial court expressed its concern the prosecution possibly committed *Doyle* error during defendant's cross-examination. Defense counsel then moved for a mistrial. While the court eventually denied the motion for a mistrial, it struck the entirety of the prosecution's cross-examination of defendant, advising the jury that the cross-examination already conducted should not be considered. After the prosecution's second effort to cross-examine defendant, defense counsel made a new motion for a mistrial, again citing *Doyle* error. This new motion was also denied.

On May 24, 2022, the jury found defendant guilty of both counts alleged in the amended information. On June 24, 2022, the trial court suspended the imposition of sentence and granted defendant probation for a period of three years. Defendant was ordered to serve 210 days in custody and was given a combination of custody and conduct credit of 65 days. This appeal followed.

---

[1]     All further statutory references are to the Penal Code.

2.

## FACTUAL SUMMARY

On the evening of September 26, 2021, defendant and his wife of over 30 years were home together when they started to argue. Wife blamed the argument on the influence of alcohol and stress, which ultimately escalated to the point of a "meltdown" in their bedroom. When the argument became physical, wife repeatedly pushed defendant down to their bed, causing defendant to grab a .357-caliber revolver he kept under his pillow. Defendant then struck wife on the head three or four times with the handle or butt of the gun. Defendant also struck wife once on her elbow as she raised her arm to protect her head. Defendant then placed a call to 911.

When the police arrived, wife described the altercation to an officer as somewhat mutual. Officers eventually placed defendant under arrest. Officer Brandon Wilkins read defendant his *Miranda*[2] rights. Defendant initially told Wilkins he did not want to speak about the incident. However, defendant then made numerous comments, including some one officer determined to be relevant to the investigation. For instance, when overhearing officers discussing wife's statement that defendant struck her with the butt of the gun, defendant responded, " 'Yeah. I didn't shoot anyone.' "

After concerns were raised about his blood pressure, defendant was taken to the hospital before being booked into jail. Officer Mitchell King, who was one of the police officers who responded to defendant's 911 call, also accompanied defendant to the hospital, and stood guard outside his room. To make use of his time, King decided to dictate his investigative notes while standing guard. Hearing what King was doing, defendant called out to him, causing King to turn on his body camera. Defendant told King he wanted to give his own side of the story. King reminded defendant that officers previously read defendant his *Miranda* rights, and that he had declined to talk. King asked defendant if he wanted to speak to an attorney. Defendant said he did not, but he

---

**2**      *Miranda v. Arizona* (1966) 384 U.S. 436.

thought the officer was only "going with" one side of the story, and defendant did not think that was "okay."

## *Defense*

Defendant testified on his own behalf. Defendant stated his wife had been drinking to excess during the evening, and he was concerned. After he decided to hide her bottle of whiskey, defendant claimed wife became upset and started an argument. Defendant testified he had not been drinking because of his own health concerns. When addressing the ensuing argument, defendant claimed wife first initiated the physical part of the fight by pushing him down on their bed repeatedly. Believing it was necessary to protect himself, defendant grabbed his pistol from under a pillow and hit wife with the butt of the gun. Once he was able to reach the telephone, defendant called the police. Later in his testimony, defendant reiterated his belief that he was acting in self-defense.

## **DISCUSSION**

## I.     **The Standard of Review**

The United States Supreme Court in *Doyle* held that impeachment testimony focused on a petitioner's silence at the time of arrest, but after receiving *Miranda* warnings, constituted a violation of the due process clause of the Fourteenth Amendment. (*Doyle*, *supra*, 426 U.S. at p. 619.)  " '*Doyle* rests on "the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial." ' " (*Greer v. Miller* (1987) 483 U.S. 756, 763, citing *Wainwright v. Greenfield* (1986) 474 U.S. 284, 291.)

In *Greer*, the United States Supreme Court explained that a *Doyle* violation has two components. The first component is that the prosecutor makes use of a defendant's postarrest silence for impeachment purposes. The second component is that the trial court appears to permit such a use when it overrules a defense objection, thereby giving the jury the unmistakable impression that what the prosecution is doing is legitimate. (*Greer v. Miller*, *supra*, 483 U.S. at pp. 761–764.)  However, the "*Doyle* rule is not

4.

violated when ' "the evidence of defendant's invocation of the right to counsel was received without objection and the remarks of the prosecutor did not invite the jury to draw any adverse inference from either the *fact* or the *timing* of defendant's exercise of his constitutional right." ' " (*People v. Thomas* (2012) 54 Cal.4th 908, 936.)  Violations of *Doyle* will require reversal unless they meet the standard set out in *Chapman v. California* (1967) 386 U.S. 18,[3] that the error was harmless beyond a reasonable doubt. (*People v. Riggs* (2008) 44 Cal.4th 248, 299, 311; see also *People v. Earp* (1999) 20 Cal.4th 826, 858.)

## II.     The Potential Violations of *Doyle*

### A.     The First Cross-Examination of Defendant

During the first cross-examination of defendant by the prosecution, the following exchanges occurred:

> "[Prosecutor].  Okay.  And you were talking to Officer King?
>
> "[Defendant].  I believe so.
>
> "[Prosecutor].  And in the video that we saw, you made those statements to him; right?
>
> "[Defendant].  The statements—obviously, yes.
>
> "[Prosecutor].  Okay.  And when you spoke to them, you didn't mention anything about self-defense, did you?
>
> "[Defendant].  No, I did not.
>
> "[Prosecutor].  And at no time while speaking with officers did you say you had been assaulted by your wife?
>
> "[Defendant].  No, I did not.

---

[3]     Partially overruled by *Brecht v. Abrahamson* (1993) 507 U.S. 619, 622–623, holding that the standard "harmless beyond a reasonable doubt" is not applicable in habeas cases.

"[Prosecutor].  And at no time while speaking with officers did you show them any injuries from her assaulting you?

"[Defendant].  No, I did not.

"[Prosecutor].  And you never said that she was standing over you while you were on the bed?

"[Defendant].  No.  Because I—I never made no—any statements.

"[Prosecutor].  Okay.  Well, you spoke with Officer King; right?

"[Defendant].  I didn't say what actually happened.

"[Prosecutor].  But you said that you had hit her with the butt of a gun?

"[Defendant].  Yes.

"[Prosecutor].  You didn't think it was important to also tell this other information?

"[Defendant].  I didn't think it would matter, because they were going to do what they were going to do.

"[Prosecutor].  But he gave you several opportunities to tell [your] side of the story; right?

"[Defendant].  Yes.

"[Prosecutor].  And you still didn't do that?

"[Defendant].  No, I didn't.

"[Prosecutor].  But you admitted to hitting her with the butt of the gun?

"[Defendant].  Yes.

"[Prosecutor].  In fact, this is the first time here on the stand that you're saying that you were defending yourself; isn't that right?

"[Defendant].  Yes.

"[Prosecutor].  And you never told the officers that your wife had pushed you?

"[Defendant].  No, I did not.

"[Prosecutor].  Or that you just wanted to get away from her?

"[Defendant].  No, I did not.

"[Prosecutor].  Or that you believed you were in any danger?

"[Defendant].  No, I did not.

"[Prosecutor].  But it would have been important to tell them, though; correct?

"[Defendant].  I—I didn't—at that time, I didn't believe it would have made a difference."  [¶]  …  [¶]

"[Prosecutor].  And while you were at the hospital, Officer King even gave you multiple chances to tell … what happened; right?

"[Defendant].  I believe so, yes."  [¶]  …  [¶]

"[Prosecutor].  But after September 26th of 2021, you could have gone to the police station to tell the officers your side of the story?

"[Defendant].  Well, after the 26th, I was in jail.

"[Prosecutor].  Okay. Well, you were out at some point; right?

"[Defendant].  Yes.

"[Prosecutor].  Okay.  And did you go to the police station—

"[Defendant].  No.

"[Prosecutor].  And you could have picked up the phone and called the Merced Police Department, as well?

"[Defendant].  Well, I—I don't want to press charges or anything like that. I didn't want anything to happen to my wife.  [¶]  So it was just something that happened so fast.  It was over with.

"[Prosecutor].  Okay.  Well, my question was:  [¶] Could you have picked up the phone—

"[Defendant].  Yes, I could have.

"[Prosecutor].  But you didn't?

"[Defendant].  No, I didn't."

7.

At the conclusion of defendant's cross-examination, the trial court excused the jury for the remainder of the day to address other related matters in the case. The following morning, the court informed the prosecution and defense counsel that he had concerns about how the prosecution had conducted cross-examination, believing there might have been a violation of *Doyle*. After quoting much of the testimony we highlighted above, the court stated, "I think it's *Doyle* error. I think it's *Doyle* error to comment on his right to remain silent once he was *Mirandized*."

After allowing the prosecution some time to review the transcript of her cross-examination, and after hearing arguments from both parties, the court ruled as follows:

> "I think it can be cured by an instruction to the jury that they're not to consider the defendant's post-*Miranda* silence in any way and for the Court to strike the questions and answers that were given and allow further cross-examination basically this morning. We were on cross-examination of [defendant]. The Court can strike that—those questions and answers from the record and order them not to consider them for any purpose and then allow [the prosecutor] to continue cross-examination.

> "I think it would be hard to go through the transcript and strike certain sections because it's just replete. I mean, you ask him later about going to the police department and following up with the police and making further statements toward the end of that cross-examination, and there's about ten-pages[] worth.

> "So my tentative is just to strike the cross and order the jury to not consider it for any purpose and to allow cross-examination anew."

Just before the prosecution was allowed to cross-examine defendant again, the court instructed the jury as follows:

> "One of the things that you need to understand is that when somebody is *Mirandized* and they don't make a statement to the police, that fact cannot be used against the criminal defendant in any way later at the trial. Okay?

> "[T]he Court sua sponte is going to strike the cross-examination testimony of [defendant] that you heard yesterday. Okay? That means that

you can't consider it for any purpose. And [the prosecutor] is going to basically start her cross-examination anew—okay?—today. And if you ask for readback testimony, you won't have that because it's been stricken from the record. And I will—I will instruct you later that anything that's been stricken from the record can't be considered for any purpose."

## B. The Second Cross-Examination of Defendant

During the second cross-examination of defendant by the prosecution, the only references to prior statements made by defendant on the night of the incident were as follows:

"[Prosecutor]. And then when you spoke to Officer King at the hospital, you admitted that you do drink wine; isn't that right?

"[Defendant]. No, I don't.

"[Prosecutor]. But you told Officer King that you do?

"[Defendant]. I don't recall that." [¶] … [¶]

"[Prosecutor]. Now when you were at the hospital, you asked to speak to Officer King again; right?

"[Defendant]. Is that Officer King? (Indicating.)

"[Prosecutor]. Yes.

"[Defendant]. He was outside the door.

"[Prosecutor]. Okay. And you called out to him?

"[Defendant]. He was—he was doing what he was—what he has to do as far as, I believe, on your phone or something, and then I was in the room. And when he said—he stated 'felony' something, and then that's when I said to him—I was in the room. He was outside the door. And I said, 'Felony?' I said, 'I'm the victim.'

"[Prosecutor]. Okay. And then that's when you told him that you had hit your wife with the butt of the gun?

"[Defendant]. I—I don't believe I told him I hit my wife with the butt of the gun because I didn't say anything to anyone."

9.

Following both instances, defendant was shown evidence or pointed toward testimony that contradicted the statements he made in this second cross-examination. We believe this was proper use of defendant's post-*Miranda* statements for impeachment. While *Doyle* bars the use of silence following a *Miranda* warning, "*Doyle* does not apply to [a] cross-examination that merely inquires into prior inconsistent statements." (*Anderson v. Charles* (1980) 447 U.S. 404, 408.) This type of questioning is not an unfair use of silence because the defendant voluntarily spoke after being *Mirandized* and did not remain silent. (*Ibid*.) The question we must still resolve, however, is whether any potential harm created during the first cross-examination both violates *Doyle* and requires reversal.

### III.  Analysis

Before proceeding with our analysis of any *Doyle* error, we must address the People's claim that defendant forfeited his ability to raise this issue on appeal. We do not believe this issue has been forfeited. While it is true the issue was not initially raised by defendant at the trial level following his first cross-examination, the issue was raised by the trial court itself. After the court raised the issue and expressed its concerns, and the parties had an opportunity to review the transcript of the first cross-examination, defendant's attorney finally made a motion for a mistrial.[4] Furthermore, the court struck the entire first cross-examination and admonished the jury not to consider any of the information obtained during that first cross-examination. Based on this record, and because *Doyle* error can have enormous impact on a jury's view of the evidence, we choose to address the issue here, out of an abundance of caution. (See *People v. Collins* (2010) 49 Cal.4th 175, 226 [discussing the importance of an admonition].)

---

[4]  Before making the motion, defendant's trial counsel admitted not raising a challenge to the first cross-examination, but stated, "I was prepared to object had the testimony—or had that line of questioning continued."

10.

" 'Most constitutional errors are subject to harmless error analysis because they do not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.' " (*People v. Rubio* (2004) 121 Cal.App.4th 927, 934, citing *Neder v. United States* (1999) 527 U.S. 1, 8–9.) Following our review of the entire record of the trial provided in this appeal, we conclude any error potentially created during the first cross-examination was harmless beyond a reasonable doubt.

The evidence presented in this case from both wife and defendant, who were direct participants and witnesses to the allegations of the amended information, established defendant hit wife on the head with the butt of a handgun. Both defendant and wife testified about the argument they had, agreeing the argument probably escalated because of wife's state of inebriation. This argument eventually became physical as wife repeatedly pushed defendant down to the bed. Defendant explained during his direct testimony that he felt the need to obtain the handgun he regularly kept under his pillow when she would not stop pushing him.

Much of this testimony was consistent with statements made by wife at the time of the incident, which was contained in the transcript of body camera video taken by an officer who responded to the 911 call. For instance, wife told King that defendant hit her on her head with the butt of a handgun. During this conversation, wife also confirmed that defendant was the one to call 911 asking for police to respond to the home. A second body camera video taken by King shows an ongoing discussion between King and defendant who wanted to make sure his side of the incident was reflected in whatever report he was preparing. The transcript of this video highlights King's repeated reminders to defendant that he had received his *Miranda* warnings and had chosen to be silent. After these reminders, defendant stated he was the one who called the police and, "I didn't hit her on the head with it, uh, with a gun. I hit her on the head with the butt of the gun. And I wasn't—I wasn't gonna shoot her."

11.

We further note the trial court's decision to strike the first cross-examination and admonish the jury that they could no longer consider that portion of the testimony as evidence in the case. Jurors are routinely instructed how to treat evidence and for what purposes evidence can be considered. Courts ordinarily presume jurors understand and follow the instructions they are given. (E.g., *People v. Williams* (2000) 79 Cal.App.4th 1157, 1171.) Furthermore, we accept the presumption that jurors understand and follow instructions as "[t]he crucial assumption underlying our constitutional system of trial by jury .…" (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

We believe the above cumulative testimony and evidence of the police interactions on the night of the incident, along with the trial court's caution in striking the first cross-examination and admonition to the jury supports the conclusion any error that might have occurred during the first cross-examination was harmless beyond a reasonable doubt under the standard set out in *Chapman*. We not only presume the jurors understood the admonition given to them by the court but have been presented with no evidence showing the jurors failed to follow the admonition when considering the evidence. The evidence supports defendant's convictions for inflicting corporal injury on a spouse and assault with a firearm.

## DISPOSITION

The judgment is affirmed.